UNITED STATES, Appellee

v.

RADOLFO J. VOLANTE, Private First Class,
U. S. Marine Corps, Appellant

4 USCMA 689, 16 CMR 263

No. 4382

Decided September 24, 1954

John Palumbo, Esq., Phillip H. Williams, Esq., CDR Robert W. Collins, USNR, and CDR John T. Davies, USN, for Appellant.
CAPT Wesley C. Blake, USMC, for Appellee.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

A general court-martial convicted the accused of larceny in violation of Article 121, Uniform Code of Military Justice, 50 USC § 715. His sentence, which was affirmed by a board of review, includes a dishonorable discharge and confinement at hard labor for one year. We granted review to consider the following issue:

"Whether the law officer erred in admitting the evidence obtained as a result of the search by Sergeant Housman."

The accused was a member of Headquarters Service Battalion, Marine Corps School, Quantico, Virginia. He worked as fountain clerk at the Basic School Branch of the Marine Corps Exchange. Three others made up the exchange staff. These were Corporal Kerrigan, Sergeant Renzi, and Sergeant Housman. The last-named was the exchange steward. Exchange personnel receive extra compensation for their services. It is the practice, however, to make up shortages in the exchange accounts by deductions from this pay.

On Saturday morning, June 28, 1952, a physical inventory of the stock and cash of the store was completed. This inventory was made in anticipation of the periodic Exchange Council inspection which was to take place the following Monday. A shortage was found. Apparently, after some discussion of the shortage, the accused left the store. When he had departed, Sergeant Renzi suggested to Sergeant Housman that they search his personal effects.

For about two weeks, Renzi had been suspicious of the accused's manner of registering his sales. Shortly before the day of the inventory, this suspicion increased when the accused exhibited money orders stubs in the amount of $210.00 which he represented to be savings. Kerrigan had the same suspicions.

Sergeant Housman telephoned Master Sergeant Blanch, the Chief Steward of the Exchange, to inform him of the situation. He asked Blanch if he should go through the accused's locker. Neither Blanch nor Housman appeared as witnesses, but, during cross-examination and in response to specific defense questions, Renzi and Kerrigan were permitted to testify that Blanch's reply to Housman's inquiry was, "You had better do something about it or it will be your neck if you don't." On con-

690

cluding the telephone call, Renzi and Kerrigan instituted a search of the accused's room. At least Renzi knew, from a previous experience, that an officer and the accused should be present during the search. However, he was satisfied to proceed without them because the accused was to be transferred on Monday, and, "We didn't want to be stuck with the shortage and have our pay checked." Kerrigan entertained the same idea.

The search covered the accused's wall and foot lockers. The door of the former was closed, but unlocked. The latter was closed and locked. Sergeant Renzi opened it by using his own key, which he "jiggled . . . around a few times." Examination of these lockers disclosed $53.00 in cash and a quantity of merchandise, some of which bore exchange price tags.

Sergeants Housman and Renzi made an immediate personal report to Lieutenant Colonel J. W. Haggerty, the Exchange Officer. Colonel Haggerty had not given permission to make the search, and the report was the first information that he had about the matter. He communicated with the Provost Marshal's office. When two investigators arrived, he informed them of the situation, and directed them to interview the accused and to make a further search of the lockers.

The investigators proceeded to the store. When the accused arrived, shortly afterward, they identified themselves to him and warned him of his rights under Article 31, Uniform Code of Military Justice, 50 USC § 602. They first interrogated him, and later, made a search of his wall and foot lockers. The money and the articles in it were assembled. After several explanations accounting for his possession of them, the accused "finally said, yes, he had taken everything" from the store.

Over defense objection, Renzi and Kerrigan were permitted to testify to the results of the search supervised by Sergeant Housman. In admitting this evidence, the law officer ruled that, although the search was not legal, Housman and the others were acting only as private individuals and not in an of-

ficial capacity. Later in the trial, defense counsel objected to the results of the search by the Provost Marshal investigators and to the inculpatory statements of the accused, on the ground that they were derived directly from Sergeant Housman's illegal search. These objections were also overruled.

The principles governing search and seizure are generally well-settled, but application of them to particular facts frequently presents difficulty. See United States v. Wilcher, 4 USCMA 215, 15 CMR 215. So in the instant case, the question is, which of two principles applies. Sergeant Housman's search was not authorized by competent authority, nor was it otherwise legal. Manual for Courts-Martial, United States, 1951, paragraph 152. Cf. United States v. Davis, 4 USCMA 577, 16 CMR 151. When proper objection is made, evidence is inadmissible if obtained as a result of an illegal search conducted by or on behalf of United States officers acting in the enforcement of its laws. Gambino v. United States, 275 US 310, 72 L ed 293, 48 S Ct 137. On the other hand, evidence obtained as a result of such a search by a private person is admissible. Burdeau v. McDowell, 256 US 465, 65 L ed 1048, 41 S Ct 574; Bacon v. United States, 97 Fed 35 (CA 8th Cir 1899), cert den 175 US 726, 44 L ed 339, 20 S Ct 1022. These principles are expressed in the Manual for Courts-Martial, supra, as follows (pages 287–288):

"Evidence is inadmissible against the accused if it was obtained as a result of an unlawful search of his property conducted or instigated by persons acting under the authority of the United States. . . ."

The critical question here is whether the search was made "by persons acting under the authority of the United States." The law officer found that Sergeant Housman acted only as a private person motivated by personal interests. If there is substantial evidence to support that finding, it must be sustained. United States v. Wilcher, supra.

Plainly, not every search made by

691

persons in the military service is under the authority of the United States. However, we need not attempt to establish categories of persons or situations which will make the search either official or private. Certainly, a search by a person duly assigned to law enforcement duty and made for the sole purpose of enforcing military law, is conducted by a person acting under the authority of the United States. See: United States v. Wilcher, supra; District of Columbia v. Little, 178 F2d 13 (CA DC Cir 1949), aff'd on other grounds, 339 US 1, 94 L ed 599, 70 S Ct 468. None of the persons who made the initial search here was assigned to law enforcement duties. But the absence of such assignment is not determinative of the problem.

In the military establishment, law enforcement is frequently an integral part of the broader problem of military command. Thus, a search by one having direct disciplinary power over the accused is one under the authority of the United States. This principle was specifically recognized by an Air Force board of review in United States v. Moorleghem [ACM 3558] 4 CMR (AF) 549. In that case, a corporal and a sergeant searched the accused's locker when they accidentally discovered he had in it mail belonging to other persons. In holding the evidence admissible, the board of review said (page 553):

"We conclude that where a person, such as the victim of a larcenous taking, assumes without authority to search the effects of another, for the purpose of discovering the thief and recovering his property, *or otherwise acting for private purposes rather than as either a disciplinary or law enforcing agent*, he is to be regarded as a mere stranger, so that the products of his search or seizure are not within the rule making such evidence inadmissible in a court-martial." [Emphasis supplied.]

In United States v. Doyle, 1 USCMA 545, 4 CMR 137, this Court inferentially recognized this relationship between direct disciplinary authority over an accused and the admissibility of evidence obtained from a search conducted by a person possessed of that power. Sustaining the admissibility of evidence obtained from a search by a Navy master-at-arms, we said:

". . . It is appropriate that the disciplinary representative of the commanding officer should normally be the person to which this function is entrusted. In the Navy, this is, traditionally, the *master-at-arms*."

From an analysis of the provisions of the Marine Corps Manual dealing with the operation of exchanges, it seems that no true disciplinary relationship exists between the exchange steward and military attendants. The character and duties of the steward are described as follows:

"1. The exchange steward may be either a civilian or enlisted person. If an enlisted person, he should be a noncommissioned officer having the necessary business qualifications and knowledge of accounts. He should be of unquestioned integrity, have the character necessary to enforce order and discipline in the exchange, and possess the full confidence of the exchange officer in all respects.

"2. The exchange steward will be responsible to the exchange officer for the merchandise and property committed to his charge, and will be held responsible for any loss occurring in the exchange due to failure on his part to exercise due care and diligence in the discharge of his duties." [Marine Corps Manual, Vol. 1, paragraph 18152.]

Coupled as it is with a description of desirable traits of character, the phrase "enforce order and discipline in the exchange" does not appear to constitute a grant of disciplinary authority. But, even if considered an indirect delegation of authority, it would appear to extend only to the control of disturbances which interfere with the peace and decorum in the store. However, it is unnecessary to determine the full extent of the Manual provision. We may assume for the purposes of this case

that a search by the head of a Government facility has sufficient color of officiality to come within the meaning of a search by "persons acting under the authority of the United States." See Blok v. United States, 70 A2d 55 (D. C. Mun. Appeals), aff'd 188 F2d 1019.

Unfortunately, neither Sergeant Blanch nor Sergeant Housman testified at the trial. Consequently, we do not have the benefit of their understanding of the former's admonition to the latter that he had better "do something" or it would be "his neck." The question, therefore, is what meaning or meanings can reasonably be given to it. On the one hand, it may be regarded as a reminder that official responsibility for operation of the exchange store rested upon Sergeant Housman and that he should exercise his own judgment in the matter. It is equally reasonable to consider the statement as a disclaimer by a superior of all official interest in the matter; the inference being that whatever steps were necessary to correct the situation were to be taken by the subordinate, as an individual. Support for this latter interpretation is found in the actions of Sergeant Housman.

Although urged to institute an immediate search, Housman, instead, called the Chief Steward. He specifically asked his superior whether he should search. This inquiry was summarily turned aside. He was, therefore, left without any official sanction for his action. Although fully aware of that, he still chose to search. His reason appears in Renzi's testimony that, "We didn't want to be stuck with the shortage and have our pay checked." These circumstances indicate action in a private capacity.

Thus, there is clear conflict in the evidence as to the actual status of Sergeant Housman at the time he conducted the search. This conflict was determined by the law officer in ruling on admissibility of the evidence as to the results of the search. He found that Sergeant Housman acted as a private individual and not in an official capacity. As a matter of law we cannot say that this finding is not supported by substantial evidence. United States v. Wilcher, supra. Consequently, there is no error in the admission of the evidence obtained as a result of the search by Sergeant Housman.

The decision of the board of review is affirmed.

Judge LATIMER concurs.

BROSMAN, Judge (concurring):

The law of this case is uncomplicated and quite clear; difficulty only arises in its application. However, a critical examination of the record of Volante's trial has convinced me that enough was present to sustain the law officer's ruling with respect to the admissibility of the information obtained through the challenged search. I am reasonably sure that I would not have decided the issue as he did—but this is quite beside the mark, for there was sufficient evidence to support his determination.