UNITED STATES, Appellee

v.

RAY E. BALL, Private E-2, U. S. Army, Appellant

6 USCMA 100, 19 CMR 226

101

No. 5874

Decided June 24, 1955

LT COL Joseph L. Chalk, U. S. Army, and 1ST LT Albert T. Ussery, U. S. Army, for Appellant.

LT COL Thomas J. Newton, U. S. Army, and 1ST LT A. Kenneth Pye, U. S. Army, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

The present appeal arises from a rehearing. At his first trial, the accused, an Army private named Ball, was charged with, and found guilty of, the theft of a United States Treasury check payable to one Michael Stavola, and a forgery of the payee's signature thereon, in violation of the Uniform Code of Military Justice, Articles 121 and 123, 50 USC §§ 715 and 717, respectively.

II

The evidence reveals that on November 9, 1953, the accused presented the check in question to an American Express office in Schweinfurt, Germany, for payment. When asked for identification, he produced a letter—purportedly from an Army officer—which stated that the identification card of Michael Stavola had been lost. The officials of the Express Company became suspicious, locked the building to prevent the accused's escape, and summoned the military police. Ball attempted at that time to destroy the check, but was prevented—and it became an exhibit at the trial. A further exhibit took the form of a "proof of identification" which the accused—in his role as Stavola—had executed at the American Express office. However, the purported official certificate indicating that Stavola's identification card

had been lost was not found by investigators, and consequently was not introduced in evidence.

Initially Ball had been "questioned" with respect to the check by a warrant officer named Freeman, who was attached to a nearby Criminal Investigation Detachment, as well as by a Captain Austin, assigned to the accused's own regiment. After a certain amount of "questioning," Freeman warned Ball of his rights under Article 31, 50 USC § 602, and thereafter "interrogated" him—as the former put it—for some three or four hours. During this interview, Freeman appears to have told the accused that, if he would tell the truth with respect to where he had obtained the check, "Captain Austin would take care where he would get off with a minor sentence or minor charge or whatever you call it." The accused maintained that he had found the check; that accompanying it was the certificate stating that Stavola's identification card had been lost; that the check was indorsed at the time he found it; and that thereafter he had sought to cash it at the office of the American Express Company. He admitted that, without authority, he had placed Stavola's name on the identification form required by the American Express Company.

Some three or four hours after warn-

ing the accused of his rights under Article 31, Freeman requested that the former prepare certain handwriting exemplars. According to him, he explained to Ball that "if you did cash this check and the handwriting specimen you give us matches, that shows you cashed it. If you did not cash it and the handwriting is different than that shown on the check, then that shows that you did not cash it." The numerous handwriting samples thereafter submitted by Ball became exhibits at his trial, and constituted the basis for expert testimony to the effect that they were executed by the person who had placed Stavola's name on the Treasury check in question.

At about the time the accused began the preparation of these signature specimens, another investigator—a Sergeant Saylor—assumed charge of the case in succession from Mr. Freeman. Saylor did not suggest to the accused that he could not lawfully have been required to prepare the exemplars—but later, and before taking a statement from him, he warned the accused once more of his rights under Article 31. In addition, and with noteworthy caution, he specifically stated " 'I don't know what Mr. Freeman or anyone else told you. Whatever they told you heretofore, please forget it.' " Thereafter the accused executed a written statement, the contents of which corresponded generally to what he had earlier told Freeman—and it was this statement supplied to Saylor that the Government relied on at the accused's first trial.

When he reviewed the record of that proceeding, the staff judge advocate to the convening authority concluded that, under the circumstances, there was doubt that the written statement made to Saylor was voluntary. The fact that both statements were made within a twenty-four hour period, were substantially identical, and were furnished to investigators associated with the same office, convinced the staff judge advocate that the objectionable conditions of the Freeman interrogation had not been dissipated when the accused made his later admissions to Saylor.

As the staff judge advocate appropriately noted, "It is astonishing that an agent of the CID would attempt to extract a confession or statement by making promises of leniency and to indulge in what Mr. Freeman naively characterized as mere 'questioning' of the accused prior to warning the accused as prescribed by Article 31." Accepting his legal advisor's recommendation, the convening authority disapproved the findings of guilty of larceny, but approved those of forgery, as well as the sentence. An Army board of review—concluding that the convening authority had underestimated the pervasive character of the error, and that its effects permeated both sets of findings—ordered a rehearing as to the forgery.

At this rehearing, the Government relied solely on the testimony of Stavola to the effect that at no time had he received or indorsed the Treasury check, and that of Express Company officials concerning the accused's presentment of the paper for payment, together with the mentioned handwriting exemplars, and certain expert evidence that they were the product of the individual who had forged Stavola's name. Neither the statement made to Saylor nor that given Freeman was used in any way by the prosecution.

This second court-martial found the accused guilty, and sentenced him to receive a dishonorable discharge, as well as to total forfeitures and confinement at hard labor for one year. The findings and sentence were approved by the officer who had convened the rehearing court-martial, and his action was affirmed by a board of review in the office of The Judge Advocate General, United States Army. The question before us has to do with the admissibility of handwriting specimens, to which the defense counsel had objected strenuously at the rehearing.

### III

The Manual for Courts-Martial provides that a suspect may lawfully be ordered to furnish a specimen of his handwriting or to utter words for use in identification. However, we were recently required to invalidate this provision because of our view that it con-

103

flicted with the intendment of Congress in enacting Article 31(*a*) of the Code, supra. See United States v. Rosato, 3 USCMA 143, 11 CMR 143; United States v. Eggers, 3 USCMA 191, 11 CMR 191; and United States v. Greer, 3 USCMA 576, 13 CMR 132. The defense has contended that, not only must an investigator refrain from directing a suspect to furnish samples for identification, but also that he must warn the accused specifically of his right to refuse to furnish them.

The warning to a suspect, or an accused person, that he enjoys a privilege against self-incrimination ■ is not a constitutional requirement. Indeed, the military establishment is one of the very few American jurisdictions in which mention must be made of the suspect's right to remain silent. However, the necessity for a warning is not coextensive with the privilege against self-incrimination. For instance, in United States v. Howard, 5 USCMA 186, 17 CMR 186, we concluded that the warning provision of Article 31(*b*) did not, under certain circumstances, apply to witnesses testifying before a court-martial. It is clear, however, that under Article 31(*a*), the same witness would have been entitled to *claim* the privilege—just as it might have been claimed by any witness in a Federal civilian court.

Neither in Rosato, in Eggers, nor in Greer, did we hold that there existed under the Code a requirement ■ ment that an accused be warned of his privilege to refuse to furnish handwriting samples —with the result that this issue remains open. Its solution demands that we focus our attention on the language of Article 31(*b*)—and especially on the words "interrogated" and "statement." It seems clear to us that these words are directed toward *testimonial* utterances alone. While handwriting exemplars or voice specimens demand conscious action on the part of an accused, or a suspect, and the exercise of voluntary processes, we are sure that neither constitutes a "statement." See Cox v. State, 126 Tex Cr 202, 70 SW2d 1005. Nor does the request therefor involve

an "interrogation." In our view, these words distinctly signify language, or its equivalent, which has relevance to one's guilt or innocence because of its content—its truth or falsity—and not because of its manner of utterance or the like. Thus, we must hold that a handwriting specimen is inadmissible only when obtained under some form of compulsion from one accused or suspected of crime.

IV

In neither record of trial is there a suggestion of compulsion or of coercion. No threats were used—al- ■ though there was offered an inducement which, for the sake of argument, we shall assume to have been unlawful. Moreover, we shall concede that this inducement produced both of the accused's statements. Let us suppose, in addition, that the handwriting specimens in question were also prepared in response to the same unlawful inducement, and were executed because the accused felt that by doing so, he might somehow fare better. Article 31(*d*) provides that:

"No statement obtained from any person in violation of this article, or through the use of coercion, unlawful influence, or unlawful inducement shall be received in evidence against him in a trial by court-martial."

If a handwriting exemplar does not constitute a statement within the meaning of Article 31(*b*), then it can scarcely qualify as such for the purposes of Article 31(*d*). Thus this section, too, is inapplicable—and we are remitted to Article 31(*a*). Since no threats, orders, or physical compulsion are suggested by the record, 31(*a*) would also appear to be without effect. Indeed, to invoke it we would be required to speculate that the accused would have declined to furnish exemplars had he not previously made the Freeman statement—which resulted from an assumed unlawful inducement, and a failure on the investigator's part to warn Ball of his right to remain silent. This necessarily leads to an inquiry into the "fruit of the poisonous tree" notion. Cf. Nardone v. United States, 308 US 338, 84 L ed 307, 60 S Ct 266.

104

The thought of requesting exemplars can scarcely be deemed the product of the improperly obtained ▇ statements. To be sure, they were sought with an eye to verifying or disproving the accused's assertion that he had not forged the check. However, a moment's reflection will make clear that—in accordance with universal investigative methods—the Criminal Investigation Detachment would have sought handwriting samples immediately once a suspicion of forgery arose. In fact, to fail to request such exemplars would virtually have amounted to a neglect of investigative duty.

It has been argued that inclusion of handwriting specimens within the ban of Article 31(d) is required in order that the policy of the legislation be maintained. We cannot agree—and find our answer in a hypothetical situation. Suppose that Mr. Freeman, without pausing to request a statement of any sort from the accused, had sought from him samples of his handwriting or signature. Suppose, further, that he had offered an allegedly improper inducement substantially identical to that found in the present case—and in effect had informed the accused that, if he was willing to furnish exemplars essential to dispose of the matter, all charges against him would be dropped. If, under these circumstances, the accused supplied the desired specimens, there would, nonetheless, be wanting a violation of Article 31(a) of the Code —this for the reason that no compulsion would have been exercised on the accused, although a lure may have been offered which was so great as to relieve him of any wish to refuse cooperation with the investigating authorities. Article 31(b) and 31(d) would not have been involved, for there would have been present no "statement" by the accused. Moreover, no shocking abuse of human privacy or essential dignity is to be discerned—like that present, for example, in forcible catheterization. See United States v. Jones, 5 USCMA 537, 18 CMR 161. Thus, since they would have been trustworthy and relevant, the handwriting specimens would be entitled to reception in evidence.

If this is true, and if the imagined signature exemplars would have been acceptable in the face of an "unlawful inducement" thus immediately applied, then it is hard to say that they are inadmissible here—that is, in a situation in which whatever inducement there may have been must have operated much less directly. In essence, the "fruit of the poisonous tree" doctrine constitutes a logical device calculated principally to deter law enforcement agents from resorting to improper tactics in the hope that, through their use, evidence may be secured which in one way or another will be regarded as admissible. As it spoke in the Code, Congress does not appear to have felt that the policy of discouraging investigators from obtaining handwriting exemplars, by means of varying sorts of inducements, is so strong as to prevent their reception in evidence. In view of this legislative determination, it would seem inappropriate here to view, as a "fruit of the poisonous tree," specimens which might permissibly have been secured by methods identical to those employed to secure the accused's extrajudicial statements.

V

In light of the foregoing, we must hold that the challenged evidence was admissible, and that the findings of guilt are affirmed.

Judge LATIMER concurs.

QUINN, Chief Judge (concurring in the result):

The majority's construction of Article 31 in this case is unrealistically restrictive. I agree that an accused under Article 31 does not have to be told that he may refuse to provide a particular item of evidence. However, that does not mean he may be asked for a sample of his handwriting or other evidence without even a general warning.

To "interrogate" means simply to ask. True, it implies a more formal proceeding, but it still means addressing a person in an attempt to elicit information. Webster's New International Dictionary, 2d ed, page 1299.

**105**

If, without more, an accused is asked for a specimen of his handwriting, the request constitutes an "interrogation." And the response made by the accused is his reply, whether it be a detailed narrative or simply his signature. Thus, in United States v. Taylor, 5 USCMA 178, 17 CMR 178, a Military Police investigator suspected the accused of the possession of marihuana. He asked the accused to identify his clothing. Complying with the request, the accused said that a certain coat was his. This Court held that the accused's statement was inadmissible because he had not been advised of his rights under Article 31. In that case, Judge Brosman said, "we are quite without disposition to encourage experimentation on the part of military law enforcement personnel with the limits of Article 31."

Article 31 should be read as a whole. It should not be cut up into little pieces nor dissected with an alleged judicial scalpel. In my opinion Article 31 should be construed "not narrowly as through a keyhole, but in the broad light of the evils it aimed at and the good it hoped for." United States ex rel. Marcus v. Hess, 317 US 537, 557, 87 L ed 443, 63 S Ct 379, dissenting opinion of Justice Jackson. I conclude, therefore, that handwriting specimens cannot be obtained from an accused without first warning him in general of his rights under Article 31 of the Uniform Code of Military Justice. Because I consider the accused's handwriting a "statement," I also disagree with the majority's conclusion that it is admissible even though obtained by unlawful inducement.

As far as the question of unlawful inducement in this case is concerned, the record shows that the issue was fully considered at the trial. Perhaps another law officer might have come to a different conclusion. However, on the basis of the evidence, I cannot say that, as a matter of law, the law officer erred in admitting the exemplars into evidence. United States v. Volante, 4 USCMA 689, 16 CMR 263. Consequently, I concur in the result.