UNITED STATES, Appellee

v

JOHN A. BENNETT, Private First Class, U. S. Army, Appellant

7 USCMA 97, 21 CMR 223

No. 7709

Decided June 1, 1956

*Lieutenant Colonel Jackson K. Judy* argued the cause for Appellant, Accused.

*First Lieutenant Lewis W. Evans* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Thomas J. Newton.*

GEORGE W. LATIMER, Judge:

Following his trial by general court-martial, the accused was convicted of rape, in violation of Article 120, Uniform Code of Military Justice, 50 USC § 714, and attempted premeditated murder, in violation of Article 80, Uniform Code of Military Justice, 50 USC § 674. He was sentenced to be put to death, intermediate appellate authorities have affirmed, and the case comes here pursuant to the provisions of Article 67 (b)(1) of the Code, 50 USC § 654, which requires us to review capital cases.

The facts are brutal and, for the most part, undisputed. On December 21, 1954, the accused was on pass from his unit, stationed near Siezenheim, Austria. He had spent the greater part of the day drinking beer, gin, and cognac, at a gasthaus in that village. From about 3:00 p.m. to 5:00 p.m., he toured the village in an aimless fashion, entering various homes and asking for "Margaret" or "Margot." However, the witnesses who saw him during the critical period did not regard him as intoxicated. Shortly after 5:00 p.m., which was just at dusk, he accosted the eleven-year-old daughter of a customs official who lived in the village and who was returning home after going on an errand for her mother. As she walked along, the accused asked her to come with him. When she refused, he seized her, stifled her screams and dragged her into a nearby shed. He then carried her into an open field and thereafter accomplished his sexual desires by raping her. After reviving the girl by immersing her in a puddle of water, the accused completed another act of intercourse, dragged his victim to a nearby millstream, and threw her in. The child managed to make her way to the far side of the stream, where she remained immersed and "pretended to be dead" until after he left the scene. After getting out of the water, she proceeded to the nearby home of a Captain of the United States Army, where she sought aid, made fresh complaint, and gave a partial description of her assailant. She suffered extensive physical and mental injuries as a result of her agonizing experience.

The forces of military law and order moved promptly, for the accused was apprehended at about 9:00 p.m. that same evening. After a brief stop at his unit area, he was taken to the offices of the local Criminal Investigation Detachment. Although he was clearly a suspect, and inquired as to the reason for his arrest on several occasions, he was not advised of his rights under Article 31 until later. Rather, the authorities permitted him to wait at the office until about 1:30 a.m., December 22, 1954, during which time they obtained authority to search his quarters and personal effects. Prior to leaving the office, and after having learned that the investigators had obtained the required authority to search, the accused furnished them with a key to his locker. Upon receipt of the key the military agents took the accused to his billet, where they requested him to identify his locker and certain articles of his clothing which were found there. The accused was then taken back to Criminal Investigation Detachment Headquarters, fully informed of his rights under Article 31, 50 USC § 602, and interrogated. At about 3:00 a.m., he executed a full and complete statement concerning the offenses alleged here. Later that same day, he reenacted the crimes for the benefit of the investigating agents.

II

Seldom, if ever, have we been faced with a record which revealed a more vicious offense, or an accused who had less to entitle him to any consideration by the fact finders. However, that conclusion marks the beginning of our inquiry, not its end, for no life may be forfeited until it is determined that such a penalty was assessed in a proceeding free from the taint of prejudicial error. We turn, then, to the first and only real issue of importance, namely, the admissibility of accused's pretrial statement, which we will refer to as a confession.

It is certain enough that some of the

acts performed or words spoken by the accused during the search, ■ particularly the pointing out of his locker and clothing at the request of an official investigator, amounted to a statement. It was "language, or its equivalent." United States v Ball, 6 USCMA 100, 19 CMR 226. Therefore, the Government agents had a duty to warn the accused of his rights under Article 31 of the Code before eliciting the information. Under our previous holdings, had the statements or clothing been offered in evidence, an objection to that proffered evidence would have been sustained. United States v Taylor, 5 USCMA 178, 182, 17 CMR 178. However, that question is academic in this setting, for the prosecution scrupulously refrained from using any evidence that was obtained prior to warning, and it came before the court-martial solely because defense counsel elicited a recitation of the incidents from one of the investigating agents. For that reason, the problem here arises solely because the Government strengthened its case by using the after-acquired confession. Thus, the essence of our issue is confined to whether, as a matter of law, the admissions obtained from the accused at his barracks rendered inadmissible his subsequent confession which was used by the Government. United States v Dandaneau, 5 USCMA 462, 18 CMR 86. Phrased in the alternative, must the second statement be considered as the product of illegal questioning on the part of the Government agents in obtaining the clothing identification? United States v Bayer, 331 US 532, 540, 67 S Ct 1394, 91 L ed 1654, 1660 (1947); United States v Monge, 1 USCMA 95, 2 CMR 1.

At the time when the agents undertook to make a search in this case, they had obtained author- ■ ization for that course of action and were accompanied by the unit commander. Thus, the search itself was reasonable and lawful, unless the questions asked in one way or another rendered it illegal. We are sure they did not, for the billet of the accused was known; the charge of quarters was present and he was familiar with the locker assignment; accused's locker had his name across the door; the agents had noticed that identifying feature on their first visit; and access to its interior was made easy by the use of a key voluntarily furnished by accused. The articles of clothing, with the possible exception of a pair of boots about which the accused was interrogated, were all found within the locker and it was secured by a lock. We, therefore, reach the conclusion that the Government obtained possession of the property lawfully. When consideration is given to the foregoing, ■ going, it becomes apparent that the questions asked were innocuous, the answers cumulative, and the information obtained corroborative of facts well known to the parties conducting the search. Under such circumstances, it can fairly be said that the interrogation furnished the agents no advantage which could be later exploited to wring a confession out of the accused. Accordingly, we are faced with a situation where the Government obtained real evidence by a lawful search and seizure, and the questions asked were merely vocal aids to that legal process. Viewed in their true light, they were preliminary inquiries and added nothing to the knowledge of the investigator. Nevertheless, a warning should have been given.

The relative insignificance of the questioning shown in this record does not render the questioned ■ interrogation legal, but it does shed light on the issue of what led this accused to make a later detailed pretrial statement. No question of force, physical violence, coercion, compulsion or inducement is involved, and whatever information the Government illegally obtained at the time of the search was chargeable only to the failure to warn. It touched only on the identity of the locker and accused clothing, and he was apprised of the fact that his locker was to be opened and his clothing was to be seized. He had voluntarily furnished a key after overhearing a conversation in which the agents were authorized to use the force necessary to search and seize. It was then that he capitulated, and

thereafter he undoubtedly cooperated in localizing the search to his particular effects. Therefore, we believe a reasonable person could properly believe that the answers he gave to the agents during the search were such an insignificant part of the seizure that they played no part, either psychological or otherwise, in influencing the accused later to bare his breast and confess his crime. If finding the clothes can be said to have played any part in inducing the confession, the concomitant tainted admissions which accused seeks to build into an important factor were of no consequence in this drama, for the evidence obtained was not needed to relate the accused to the clothing which was seized. We, therefore, hold that the law officer could reasonably conclude that accused's later pretrial statement, if induced by anything other than a desire to unburden himself, was called forth by the results of the prior legal seizure, rather than by accused's minor admissions made contemporaneously therewith.

Before disposing of the assignment, a word should be said about the Government's position here. ■■■■■■■ We are unimpressed by its argument that, assuming the first admissions were of substance, the full warning given the accused prior to the time when he confessed could be regarded as sufficient to interrupt the chain of causation normally to be inferred from this sort of situation. In answer to that contention, it is to be remembered that we are faced with what was essentially one transaction. The search was conducted, the admissions made, the warning given, and the confession elicited and reduced to writing, all during the relatively short time period from 1:30 a.m. to 3:45 a.m. on December 22, 1954. If the impact of the admissions on the later statement had been measurable, a different result might ensue. Similarly, if we were required to accept the premise that the Government had uncovered evidence aliunde the confession, oral or real, as a result of the statements made by the accused prior to having been warned, and had placed that evidence before the court-martial,

we could not avoid the conclusion that this case would fall squarely within the rule of United States v Taylor, supra. While a majority of the Court did not reach this issue in that case, we now announce the rule that if the Government obtains admissions illegally, and they are of a nature likely to produce a subsequent confession, a strong showing that a subsequent warning severed the presumptive influence must be made to permit use of the confession. Furthermore, absent any showing that the accused knew or had been informed that his prior admissions could not be used against him, the fact that he was advised of his rights prior to the execution of his confession would normally not avoid the Taylor result. What is crucial here is our belief that the chain of events in this case ran from a legal search to a voluntary confession, and that the effect of the conversation between the accused and the agent was so slight as to be uninfluential on the subsequent disclosure. Accordingly, we conclude the law officer did not err in admitting accused's confession in evidence.

### III

The accused complains about the admission in evidence of a sketch drawn by one of the medical witnesses showing certain anatomical features of the female body and the more important physical injuries suffered by the victim in this case. Appellate defense counsel contends, just as did his counterpart at trial, that the sole purpose of this exhibit was to inflame the minds of the court-martial members to the prejudice of the accused. Although counsel urges that this document served no instructional purpose and was of no additional probative value, we reach an opposite conclusion.

The testimony of the medical witness who prepared the exhibit was undeniably complete, in and of ■■■■■ itself, but, as is so often the case with expert testimony, it was studded with technical terms and probably confusing to the fact finders in its description of the injuries found. The sketch no doubt rendered the medical testimony intel-

ligible, and to that extent it served a legitimate purpose. United States v Bartholomew, 1 USCMA 307, 3 CMR 41. So far as the exhibit is concerned, it was not prepared in a manner calculated to magnify the more odious features of this criminal attack, and we cannot conclude the law officer erred in permitting its receipt in evidence. United States v Thomas, 6 USCMA 92, 19 CMR 218; United States v Lee, 4 USCMA 571, 16 CMR 145.

### IV

The accused next urges three other alleged errors which were also assigned before the board of review. They consist of an assertion that the advice of the staff judge advocate was incomplete and insufficient; that there is a fatal variance between the specification and findings as to Charge II; and that the evidence is insufficient to sustain that charge. They were briefed and argued at that time and, after extended discussion, the board concluded that no irregularities could be found in any of these assignments. We agree that they are without merit. Under the circumstances, no good purpose would be served by a discussion of those alleged errors. It is enough to say that the board's opinion adequately disposes of them, and those interested may consult that decision to determine the basis for our ruling.

### V

We have searched the record for other possible errors or defense, particularly those touching on mental responsibility, but we have found nothing which justifies discussion. In that connection, we feel we should comment on the high level of professional competence found within this record. Defense counsel at trial, Captain James H. Boyle, defended with vigor and fidelity what was clearly a very difficult case. He conceded nothing, explored everything, was fully prepared on each issue, and made the most of what he had. The law officer's instructions were full and fair, thoroughly covering all of the issues developed by the evidence. The Government's presentation was handled ably, fairly, and bore all the marks of careful preparation. This record can be considered as showing a good example of the level of due process which can be attained when an effort is made to carry out the intent of the mandate expressed by Congress in the Uniform Code of Military Justice.

The decision of the board of review is affirmed.

Chief Judge QUINN and Judge FERGUSON concur.