UNITED STATES, Appellee

v

MORRIS A. CARTER, III, Private First Class,
U. S. Army, Appellant

15 USCMA 495, 35 CMR 467

No. 18,474

August 27, 1965

Captain James A. Buttry argued the cause for Appellant, Accused. With him on the brief were Colonel Joseph L. Chalk and Lieutenant Colonel Jacob Hagopian.

Captain John D. Jackson argued the cause for Appellee, United States. With him on the brief were Colonel Edwin G. Schuck, Lieutenant Colonel Francis M. Cooper, and Captain John C. Cortesio, Jr.

## Opinion of the Court

QUINN, Chief Judge:

This is an appeal from a conviction for larceny from a barracks mate, in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921. The principal issue is the admissibility of evidence of the discovery of the stolen money in the accused's shoe and a statement made by him at that time.

About 1:30 a.m., on August 2, 1964, Private First Class Robert L. Dorsey, known to his associates as the "Slammer" because he was heavyweight boxing champion of the Third Army, returned to his barracks. Before he went to bed he placed $145.00 in his locker, and locked the door with a key. He put the key in a pocket of his trousers, which he put on his footlocker. About six hours later, Dorsey awakened. On going to his locker, he discovered his money was missing. The only person present in the bay was the accused. He occupied the next bunk, and was a close friend.

Dorsey exclaimed that " '[s]ome SOB' " had taken his money. He and the accused inspected the locker for marks of entry, but found none. Dorsey reasoned that someone had probably removed the key from the pocket of his trousers to open the locker, and then had returned the key. The accused wondered " 'who could have taken' " the money, and suggested that it might be " 'Radeo.' " He advised Dorsey to notify the Criminal Investi-

gations Detachment. Dorsey's reaction to the suggestion was that he would " 'see Radeo later,' " but " 'now' " he wanted to search the accused's gear. The accused told him to " 'go ahead.' " Thereupon Dorsey indicated that instead of searching accused's gear, he would search the accused's person. At first, the accused "didn't want" to be searched; then he tendered his wallet to Dorsey. Dorsey examined it and saw it contained only $6.00. He told the accused he now wanted to " 'search . . . [his] shoes,' " and asked the accused to remove them. The accused refused and started to leave. Dorsey grabbed him by the shirt, tearing it. The accused continued to protest, and he demanded to know whether Dorsey considered him a criminal. Eventually he removed the right shoe, and threw it aside. Dorsey told him to take off the left shoe. The accused's response was to continue his protest against Dorsey's conduct. Dorsey "balled" his fist and said he would knock out the accused and take off the shoe himself, if the accused did not remove it. Finally, the accused took off his shoe. As Dorsey took possession of it, the accused said: " 'It's all there. I'm sorry I took it. I guess I took a joke a little bit too far.' " He followed Dorsey as he moved around the barracks, repeating that he was " 'sorry' " he took the money, he just " 'carried a joke too far.' "[1]

---

[1] Only $140.00 of the missing money was discovered in the shoe. Apparently, the accused left the Company area shortly after the discovery. Dor-

**496**

Although Dorsey's testimony about his discovery of the money was admitted without defense objection, the accused now contends the law officer should have stricken it on his own motion because the discovery of the money and the accused's statements at the time were obtained by coercion, in violation of Article 31 of the Uniform Code of Military Justice, 10 USC § 831, and the accused's rights under the Fourth and Fifth Amendments to the Constitution of the United States.

The failure to object to the evidence is troublesome. The theory of the defense was that the accused took the money merely as a joke, in accordance with a commonplace practice in the barracks of temporarily concealing the property of a barracks mate so that he would search for it, and thereby provide amusement to the others. The theory is strongly, if not best, advanced by the statements made by the accused immediately after Dorsey discovered the missing money. Reliance on this theory explains defense counsel's failure to object to evidence which he might otherwise have considered inadmissible. The affirmative use by the defense of Government ▌ ernment evidence, admitted without defense objection, normally constitutes an abandonment of all possible grounds of objection. Lawn v United States, 355 US 339, 353, 2 L ed 2d 321, 78 S Ct 311 (1958), rehearing denied, 355 US 967, 2 L ed 2d 542, 78 S Ct 529 (1958). In a similar instance of defense utilization of possibly objectionable evidence introduced by the Government, we held the accused "should not . . . on appeal be heard to complain that the actions in which he actively participated [at trial] were prejudicial." United States v Kelly, 7 USCMA 218, 224, 22 CMR 8. However, appellate defense counsel urge us to disregard what happened at trial because Dorsey's testimony is the only evidence of accused's implication in the theft. The issue, say counsel, is "so fundamental" that we should not, in the interest of justice, hold the accused accountable for his course of action at trial. Cf. United States v Fisher, 4 USCMA 152, 15 CMR 152. Although the record of trial reflects more than mere failure to object, recent judicial applications of the Fourth and Fifth Amendments invite consideration of the legal consequences of Dorsey's action. We, therefore, pass over the procedural hurdles to reach the substance of the issue.

At least since Boyd v United States, 116 US 616, 29 L ed 746, 6 S Ct 524 (1886), Federal courts ▌ have commented on the close interplay between the Fourth Amendment protection against unreasonable search and seizure and the privilege against self-incrimination provided by the Fifth Amendment. As recently as Mapp v Ohio, 367 US 643, 656, 6 L ed 2d 1081, 81 S Ct 1684 (1961), the Supreme Court of the United States described evidence of the results of an unrea-

---

sey waited for him to return. When he did, about 3:30 or 4:00 a.m., Dorsey demanded the remaining $5.00. The accused insisted that Dorsey had "miscounted" the money, and that the $5.00 "belonged to him," but after Dorsey knocked him to the ground and beat him, the accused admitted he had spent $3.00 of the $5.00. He promised to return the $5.00 to Dorsey. The evidence of this second encounter between the accused and Dorsey was elicited on defense counsel's cross-examination of Dorsey. However, on his own motion, the law officer struck out the testimony on the ground that these statements were obtained by coercion, in violation of Article 31, Uniform Code of Military Justice, 10 USC § 831. See United States v Shanks, 12 USCMA 586, 31 CMR 172; United States v Trojanowski, 5 USCMA 305, 17 CMR 305. He also instructed the court-martial to disregard the testimony and questioned the members on their ability to do so. Defense counsel indicated he was satisfied with the instruction and the court members' responses. No issue is raised on this appeal as to the effectiveness of the law officer's action. It is, therefore, unnecessary to set out all the circumstances of the second meeting between the accused and Dorsey.

sonable search and seizure as "tantamount to coerced testimony." See also Davis v United States, 328 US 582, 90 L ed 1453, 66 S Ct 1256 (1946), rehearing denied, 329 US 824, 91 L ed 700, 67 S Ct 107 (1946); Nueslein v District of Columbia, 115 F2d 690 (CA DC Cir) (1940). Nevertheless, the two provisions are separate; and there may be a violation of one Amendment without involving the other. The difference between the two provisions was explicitly noted by the Supreme Court in Curcio v United States, 354 US 118, 1 L ed 2d 1225, 77 S Ct 1145 (1957). There, a custodian of the books of a union was served with two subpoenas to appear before a grand jury. One directed him to bring the union books; the other was to obtain his testimony as a witness. He appeared before the grand jury, but did not bring the books; and he refused to answer any questions as to their whereabouts. The Supreme Court held that while he could properly be compelled to produce the books because, as custodian, he had no personal interest in them, he could not be forced to disclose their whereabouts. We have also commented on the distinction in a number of cases in which the accused was required to identify property. See United States v Taylor, 5 USCMA 178, 17 CMR 178; United States v Holmes, 6 USCMA 151, 19 CMR 277.

Whether by reason of Article 31 of the Uniform Code, supra, or the Fifth Amendment, this Court has decided for the military that an incriminating statement obtained from an accused by coercion is inadmissible in evidence against him, without regard to whether the coercion was exerted by a Government agent or a private individual. United States v Trojanowski, 5 USCMA 305, 312, 17 CMR 305; United States v Shanks, 12 USCMA 586, 588, 31 CMR 172. However, the Constitutional provision against unreasonable search and seizure has consistently been applied only to action by, or under the aegis of, Government authority. Almost a half century ago, the Supreme Court of the United States held there was no "invasion of the security afforded by the 4th Amendment against unreasonable search and seizure," when the wrong "done was the act of individuals in taking the property of another." Burdeau v McDowell, 256 US 465, 475, 65 L ed 1048, 41 S Ct 574 (1921). More recently, in extending the protection of the Fourth Amendment, through the Fourteenth Amendment, to state prosecutions, the Supreme Court noted that the Constitutional provision was a guarantee against "official lawlessness." Mapp v Ohio, supra, at page 655. United States District Judge Youngdahl succinctly stated the rule in United States v Frank, 225 F Supp 573, 575 (DC DC) (1964), as follows:

". . . The exclusionary rule applied to evidence seized in violation of the Fourth Amendment is designed to force law enforcement agents to observe the procedural safeguards of the Constitution. Where, as here, any possible irregularity . . . was solely the responsibility of private persons, with no connection or collusion of any kind with any law enforcement agent, the exclusionary rule does not apply."

The distinction between Government action and private conduct is relatively clear, and easy to discern, in the civilian community. In the military, the line of demarcation is blurred by the fact that one individual may exercise authority over another because of superiority of rank or command. This circumstance may complicate the problem in a particular case; it does not, however, eliminate the distinction between Governmental and private action. See United States v Beck, 15 USCMA 333, 35 CMR 305; United States v Dandaneau, 5 USCMA 462, 18 CMR 86. We referred to the distinction in considering the admissibility of evidence obtained by a search in United States v Volante, 4 USCMA 689, 16 CMR 263. There, a post exchange steward searched the accused's personal effects. The steward was superior in rank to the accused, but both were fellow employees of the exchange. The evidence showed the steward suspected the accused of

thievery, and made the search to determine if the accused had effected a shortage for which the steward would have been pecuniarily liable. We held the evidence was sufficient to support the trial ruling that the steward "acted as a private individual and not in an official capacity." *Id.*, at page 693. In United States v Rogan, 8 USCMA 739, at page 742, 25 CMR 243, we said: "Evidence obtained as a result of a search conducted by a private person is admissible, whereas that obtained from an illegal search by those acting under the authority of the United States is inadmissible."

In view of the close relationship between Dorsey and the accused, the change of attitude, from cooperativeness to obstructionism, undoubtedly gave Dorsey good reason to believe the accused had his money. See United States v Armstrong, 4 USCMA 248, 15 CMR 248. It is arguable, therefore, that Dorsey was merely engaged in the recapture of his own property; and that a thief, who has no legal right to the property, is not protected by the Fourth Amendment against the owner's right of recoupment. See Deck v United States, 339 F2d 739 (CA DC Cir) (1964). Cf. United States v Trojanowski, supra, at page 312. Be that as it may, the evidence leaves no room ▌ for any conclusion but that Dorsey acted exclusively in his own private interests when he searched the accused's shoes. Under established precedent, therefore, Dorsey's testimony as to the discovery of the money is admissible. Appellate defense counsel, however, contend that current cases require us to overrule these precedents and include within the protection against unreasonable search and seizure the conduct of private persons, acting for purely private purposes. None of the cases cited tend to support counsel's conclusion; and our own research has uncovered only one case which even suggests it. In a *dictum*, a District Court observed that the Constitutional provision is a "guarantee of . . .

security as against not only other persons generally but particularly against the Government itself." United States v Chodak, 68 F Supp 455, 458 (D Md) (1946). The search in *Chodak* had in fact been made by Government agents. We do not consider the *dictum* as indicating a possible trend of opinion away from the Supreme Court's holding in Burdeau v McDowell, supra. On the contrary, United States v Frank, supra, reaffirms the continued vitality of *Burdeau* in the Federal courts.

Left for consideration is whether the accused's statement about being sorry he took the money and that he had carried a joke too far was properly admitted in evidence. If the statement was coerced, it was not admissible. United States v Trojanowski, supra. Without restating the evidence, we agree with Government ▌ ▌ ernment counsel, that unlike the situation in *Trojanowski*, the circumstances here show the statement was unmistakably volunteered by the accused. The statement impresses us as an effort on the accused's part to exculpate, not incriminate, himself. As we indicated earlier, it was used at trial to establish the accused's theory of defense. We conclude, therefore, that the law officer properly allowed the statement in evidence.

The second assignment of error depends upon the exclusion of Dorsey's testimony as to the discovery of the money in the accused's shoe. Since we have decided that issue against the accused, the subsidiary question must be similarly determined.

The decision of the board of review is affirmed.

Judge KILDAY concurs.

FERGUSON, Judge (dissenting):

I dissent.

An accused of apparently nondescript size and no fistic ability is threatened, put upon, has his clothing torn off, and is physically restrained by the heavyweight champion of the United States Army until he surren-

ders money in his possession and makes apologetic statements which seal his guilt of the crime of larceny. My brothers see this as nothing more than a private search conducted by a volunteer. In so acting, I believe they misapprehend the import of our own cases, and the declaration of the Supreme Court that:

"The constitutional privilege against self-incrimination . . . grows out of the high sentiment and regard of our jurisprudence for conducting criminal trials and investigatory proceedings upon a plane of dignity, humanity and impartiality. It is designed to prevent the use of legal process to force from the lips of the accused individual the evidence necessary to convict him *or to force him to produce and authenticate any personal documents or effects that might incriminate him. Physical torture and other less violent but equally reprehensible modes of compelling the production of incriminating evidence are thereby avoided."* [Emphasis supplied.] [United States v White, 322 US 694, 698, 88 L ed 1542, 64 S Ct 1248, 1251 (1944).]

In my view, the law, justice, and fairness demand we condemn such crude extraction of evidence. I would do so.

The only evidence of accused's guilt presented in this case is concededly the product of physical coercion. Although not entirely verbal, I view it as conduct equivalent to a statement. See United States v Bennett, 7 USCMA 97, 21 CMR 223; United States v Taylor, 5 USCMA 178, 17 CMR 178. As such, it was inadmissible and, there apparently being no available substitute for use at any rehearing, I would reverse and dismiss the charges. The contrary view, in my opinion, permits a conviction to stand on the basis of a coerced confession, and I cannot join in such a result. Indeed, I would remind my brothers, in Mr. Justice Rutledge's words, that "world events running as they have been, there is special reason at this time for not relaxing the old personal freedoms won,

as this one was, through centuries of struggle. Men now in concentration camps could speak to the value of such a privilege, if it were or had been theirs. There is in it the wisdom of centuries." Wood v United States, 128 F2d 265 (CA DC Cir) (1942), at page 278.

The sole charge against the accused is the larceny of Private First Class Dorsey's funds. As is set out in the principal opinion, he was the "All-Army" heavyweight boxing champion and known to his comrades as the "Slammer," a well-earned soubriquet in light of what he did to Private Carter.

On August 2, 1964, the "Slammer" was awakened by the accused, who lived next to him, with an invitation to accompany him to breakfast. On gathering his personal gear, he discovered the sum of $145.00 was missing from his wall locker. As the locker had been locked and there was no evidence of violent entry, "Slammer" suspected the accused, the only other person then present, of taking his money. Upon communication of this intelligence to Carter, the latter denied he had stolen the funds and suggested the guilty party might be another soldier who had left earlier. Dorsey then stated his intention to search the personal possessions of both men, and, as the accused was still present, he would start with him. Accused agreed to a search of his wall locker. Dorsey immediately stated he would instead search his person. Carter demurred, but finally produced his wallet, "and he only had six bucks in it." "Slammer" then demanded that accused remove his shoes. Carter attempted to leave the room, declaring that Dorsey "was trying to treat him like a criminal." Dorsey grabbed him and "tore his shirt." He again threatened the accused and ordered him to remove his shoes. After approximately fifteen minutes had elapsed, Carter reluctantly took off his right shoe. He again denied having the money, and "I threatened him a little more." As to this, the record reveals the following:

500

"Q. What did you threaten him with?

"A. Well, I just balled my fist up. I asked him to take his shoe off, and he didn't. 'I'll knock you out and take it off myself,' I told him. So I sat there awhile. Finally he took the other one off. I saw the money. I momentarily looked at it; I reached down to pick it up and he said, 'It's all there. I'm sorry I took it. I guess I took a joke a little bit too far.' Well, I took the money and counted it and—I was all excited about getting the money back right then—and I counted all but five dollars; I only counted $140.00."

On the following morning, Dorsey decided to "make him [Carter] confess" as "we had a lot of thefts in our barracks" and also to discover what had happened to the five dollars which he had not recovered. He administered a beating to the accused, inflicting a cut which required seven stitches to close, and causing Carter to be "put on bedrest for a week . . . and he never showed up for chow for about four days. I understand he couldn't eat for four days." In the course of the drubbing, Carter admitted taking the five dollars and spending part of it.[1]

My brothers conclude the events of August 2, 1964, constitute no more than an illegal search and seizure and, as they were carried out by a private citizen, the illegality does not taint the evidence thereby obtained and render it inadmissible. It is unarguable that a search thus conducted does not bar the receipt of the proof so uncovered. Burdeau v McDowell, 256 US 465, 65 L ed 1048, 41 S Ct 574 (1921). But it is a far cry from that unimpeachable legal proposition to the holding, as here, that only a search is involved in a forced submission to the powerful persuasions of a heavyweight champion, and disclosure of the location of allegedly stolen property, together with statements made in connection therewith, admittedly uttered because the victim said, " 'I'll knock you out and take it off myself.' " To the contrary, under well-settled principles applied in this Court, such acts constitute the equivalent of statements incriminating the accused. Indeed, if they did not, this case would not be here, for they are the sole proof of his guilt, nothing else in the record connecting him or the money with Dorsey's loss.

Thus, in United States v Taylor, supra, we held an accused's pointing out the location of his overcoat, which contained marihuana, constituted a statement, and rejected the argument of the Government that the matter was nothing more than a search and seizure. Of this approach, we said, at page 182:

". . . In the course of this quest, they sought of the suspect not an identification of himself as a culprit, but solely one relating to the property or premises to be searched. A superficial validity does attach to this search and seizure approach, but it is not an essential one. Although real evidence was indeed being sought, the investigators were also attempting to insure that such evidence, if discovered, could be related to the accused by means of an utterance on his part. The discovery of the marijuana can scarcely be deemed attributable to the accused's identifying remark. Yet the circumstance that its possession was irrefutably connected with him at the trial *is* attributable to that remark. Indeed, aside from the clear connection revealed thereby, the Government would not have sought so vigorously —and over defense objection—to introduce the accused's identification of his garments. The hut shared by the accused might literally have teemed with marijuana, but if its wrongful possession could not have

---

[1] This testimony was stricken by the law officer on the basis that it was admittedly coerced, and the court instructed to disregard it. However, the court was advised that it might consider the earlier recovery of the money, and statements made in connection therewith, as evidence of accused's guilt.

been brought home to the accused—by his own admissions or otherwise—no supportable conviction could have come about. Thus, to say the present problem is merely one of search and seizure is to err in analysis."

Turning to the record before us, and applying the reasoning utilized in *Taylor,* supra, it must be found here, too, that accused's shoes "might literally have" teemed with money, without any conviction having followed, unless it was also brought home to the court that his concurrent verbalizations confessed the bills had been wrongfully taken from Dorsey's locker. My brothers seek to separate the examination of the shoes from accused's statements and find the latter "unmistakably volunteered." They cannot be so divided, for there is no doubt the pervasiveness of the "Slammer's" "balled up" fist and threat to render the accused unconscious lasted at least throughout the entire incident and practically demanded the comment of the accused as an attempt to avoid the real danger of serious personal harm which might have flowed from the very discovery of the money.[2] And yet, as in *Taylor,* supra, there could be no valid conviction here without these actual statements, for only they connect the money found in accused's possession with the money stolen from Dorsey.

Nor was our holding in the *Taylor* case an isolated incident of finding the words and acts of the accused constituted a statement governed by privilege rather than a search and seizure. In United States v Bennett, supra, we reiterated that principle and held the divulgence of the location of incriminating items of clothing "amounted to a statement." It was, we said, " 'language, or its equivalent.' " United States v Bennett, supra, at page 100. See also United States v Ball, 6 USCMA 100, 19 CMR 226, concurring opinion of Chief Judge Quinn;

and United States v Williams, 10 USCMA 578, 28 CMR 144. All these cases compel the conclusion that this so-called search and seizure constituted in reality a coerced statement and forced self-incrimination.

Having reached this conclusion, it seems clear the evidence should have been excluded by the law officer, as were the specific admissions wrung from the accused by Dorsey on the following day. And, with regard to matters obtained, as here, by use of actual physical coercion, it matters not that the instrument of accused's fear was acting in his own behalf rather than as an agent of the United States.

In United States v Trojanowski, 5 USCMA 305, 17 CMR 305, a case remarkably similar to that now before us, we held the identity of the person using coercion to be immaterial in determining the admissibility of evidence obtained by physical violence. There, one Coyman's wallet was stolen. Two days later, he questioned the accused about the theft, and upon receiving a denial of guilt, slapped him twice with his open hand. Accused, crying, then returned a portion of the stolen monies. Subsequently, accused also confessed his guilt to a lieutenant after proper warning under Code, supra, Article 31, 10 USC § 831. Under that Article, we specifically held accused's statement and return of the money inadmissible. Thus, we pointed out that its subsection (a) provides that "[n]o person subject to this chapter may compel any person to incriminate himself" and that subsection (d) of the same Article absolutely prohibited the receipt in evidence of *any* coerced statement. We declared, at page 309:

"It matters little to the ultimate conclusion that we reach, but we find only a violation of the first section [subsection (a)]. *When that provision is interpreted with section (d), it becomes crystal clear that a*

---

[2] That the danger was very real is established by Dorsey's renewal of the matter within twenty-four hours and infliction of such severe injuries on the accused as to require his hospitalization for several days.

*coerced statement is not to be received in evidence. Accepting, as we do, the board of review's holding that the accused was compelled to talk, the admission of the testimony was contrary to the provisions against compulsory self-incrimination, and consequently error was committed. . . .* [A warning was not demanded because] the victim acted solely for his own benefit and without official sanction. . . . However, because of our holding that the admission of the testimony was error because it was obtained by coercive measures, the first certified question must be answered affirmatively." [Emphasis supplied.]

The late Judge Brosman, concurring, specially noted his agreement that a coerced statement, even when secured by a private citizen, was inadmissible in evidence. Moreover, we recently and unanimously reached the same conclusion in United States v Shanks, 12 USCMA 586, 31 CMR 172. There, accused was convicted of the theft of a radio belonging to Long. It appeared that, on the day after the alleged taking, he was awakened by one Kerrin, a friend of Long's, who demanded to know if he had stolen the radio. When accused denied the theft, Kerrin began to beat him, interspersing the blows with demands for information as to the radio's location. After Kerrin left, accused began talking with Long outside. There, Kerrin came up and knocked him down, whereupon accused "told Long 'what happen[ed] out of fear, sir,'" and escorted the victim to the place at which the property was located. While we dealt directly with the question of the sufficiency of the instructions to submit to the court an issue of voluntariness of a later confession made to military police after proper warning, we clearly held the evidence raised a substantial issue as to whether this subsequent statement was the product of the earlier coercive measures used by Kerrin. We also went out of our way, in light of such violence, to call attention to the "questionable evidence . . . that, following Kerrin's blows, accused led Corporal Long to the shop

where he had apparently pawned the radio." United States v Shanks, supra, at page 588.

It seems to me these prior constructions of Code, supra, Article 31, are clearly dispositive of the case before us. They hold in no uncertain language that statements or acts equivalent thereto, such as disclosing, verbally or physically, the location of allegedly stolen property, are inadmissible if obtained by physical violence and quite without regard to whether the actor inflicting the harm is "officially" connected with the Government or not. United States v Trojanowski; United States v Shanks; United States v Taylor, all supra. I cannot distinguish between the "Slammer's" balled-up fist in this case, Coyman's openhanded slaps in *Trojanowski,* supra, and Kerrin's blows in *Shanks,* supra. If there is a difference, it is in the more serious aspect of this case in that Dorsey was not only a trained prizefighter but the "All-Army" heavyweight champion. It does not take a great deal of imagination to see how his threats could be, and were, immediately effective.

Finally, quite aside from the terms of Code, supra, Article 31(a), and our own interpretations of its prohibitions, is the separate and distinct principle that all coerced statements are to be excluded because of their inherent untrustworthiness, regardless of the author of the coercion and the fact his actions were purely private. See, generally, Wigmore, Evidence, 3d ed, §§ 827–833, and cases collected therein. See also Palmore v State, 244 Ala 227, 12 So 2d 854 (1943); Simmons v State, 206 Miss 535, 40 So 2d 289 (1949); and Balding v State, 77 Okla Crim 36, 138 P2d 132 (1943); cf. Iva Ikuko Toguri D'Aquino v United States, 192 F2d 338, 355 (CA 9 Cir) (1951). Thus, even were Article 31 (a) and (d) not in the Code, the evidence here presented would, under the authorities, necessarily be inadmissible, for, as is worth reiterating, there can be no doubt of the unlawful inducement represented by the determined tactics which the "Slammer" here employed.

In conclusion, then, and to sum up, I would hold that coercion of the accused into physically divulging the location of the alleged funds and his concomitant verbal explanation of his possession thereof constituted the obtaining of statements directly in violation of Code, supra, Article 31. United States v Bennett; United States v Taylor; United States v Trojanowski; United States v Shanks, all supra. Moreover, the fact Dorsey was not acting on behalf of the Government but as a private person is immaterial. United States v Trojanowski; United States v Shanks, both supra; Wigmore, supra §§ 830–833. Finally, all these authorities agree such statements are inadmissible in evidence, and I, for one, am unable to understand why we suddenly depart from these forceful precedents. I would not do so, and, accordingly, note my dissent.

I would reverse the decision of the board of review and, in light of the fact that, aside from the coerced statements of accused, there appears to be no evidence available to the Government, I would also dismiss the charges.