UNITED STATES, Appellee

v

MITCHELL W. GOARD, Airman Basic, U. S. Air Force, Appellant

13 USCMA 588, 33 CMR 120

No. 16,219

April 5, 1963

*Major Charles K. Rush* argued the cause for Appellant, Accused. With

him on the brief were *Colonel Joseph E. Krysakowski* and *Colonel Daniel E. Henderson, Jr.*

*Captain Richard T. Yery* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Emanuel Lewis.*

## Opinion of the Court

KILDAY, Judge:

The appellant was tried by general court-martial convened at Tinker Air Force Base, Oklahoma. Despite his pleas of not guilty, he was convicted of one offense of housebreaking, in violation of Article 130, and one offense of larceny, in violation of Article 121, Uniform Code of Military Justice, 10 USC §§ 930 and 921, respectively. He was sentenced to a bad-conduct discharge, forfeiture of all pay and allowances and confinement at hard labor for three months. The convening authority modified the value in the larceny to conform to the evidence, but otherwise approved the findings. He approved only so much of the sentence as provides for a bad-conduct discharge, forfeiture of $70.00 per month for six months, and confinement at hard labor for three months. Such findings and the approved punishment were affirmed by a board of review in the office of The Judge Advocate General of the Air Force.

On December 6, 1961, two petty officers of the United States Navy, attending an Air Force Flight Mechanics School, were billeted in a room located on the second floor of a barracks at Tinker Air Force Base, Oklahoma. Prior to departing for the flight line for duty on that day, the Navy men tidied up their room, took their books and flying gear, and secured their lockers. Upon leaving the room, at approximately 6:00 a.m., they locked the only door. When the men returned to their billet at approximately 11:00 a.m. they discovered this door to their room was unlocked. From an inspection of the room it was determined that the window blinds, which had been open at the time of their departure, were in a closed position, and that the door on one of the lockers had been pried open. The occupant of the locker immediately checked a cigar box, which he kept inside the locker, and found that the money he had previously placed inside the cigar box, amounting to approximately $55.00 or $60.00, was missing.

Further investigation revealed that the center window in the room, normally kept closed, was open about two feet, and the lower left portion of the screen appeared to have been forced away from the window in such a manner that an entry to the room could be gained from the outside. The condition of the window and screen had not been checked on the morning of the incident, but it had been checked sometime within a month's period and it had been found secured. The loss was immediately reported to the first sergeant of the school and soon thereafter an investigator arrived to determine the circumstances.

One of the Navy men went into the latrine and found that a screen on one of the windows, on the same side of the barracks as their room, and approximately three rooms away, was ajar. It was established that there was a ledge running the length of the barracks which passes underneath both of these windows, *i.e.*, the latrine and such room. The ledge was of sufficient width to support a person to stand or walk on it, because it was sometimes used while cleaning the second floor windows of the barracks.

During the course of the investigation of this occurrence, it was learned that two airmen, also billeted on the second floor of the barracks, had seen the accused near the window in this latrine and also in the vicinity of the room in question sometime around 6:15 to 6:45 a.m. on December 6th. Accused lived on the third floor of this same barracks.

In continuing his investigation, the investigator called the accused as a suspect. The accused was interrogated on four or five occasions between

**589**

the date of the occurrence and January 17, 1962. At each interview, the accused was advised of his rights by the agent reading Article 31, Uniform Code of Military Justice, 10 USC § 831, and being told of the nature of the offense. However, accused continued to deny any implication in the theft. On January 17th the accused was called again by the investigator and, after a short interview, was asked to accompany him downtown to a garage to verify a part of accused's story. After the investigator visited the garage, he told accused that they both would go to accused's commander, Major Bean—who, by the time of trial, had been promoted to Lieutenant Colonel—in order to clear up some discrepancy concerning several traffic tickets received by the accused. The resulting conference lasted for approximately three quarters of an hour, of which about five minutes was taken up with traffic tickets and the remainder concerned the barracks thefts. There is some conflict concerning what transpired, but it is clear that the investigator and commander conversed on the subject of the theft, during which numerous questions were asked of the accused, who remained steadfastly silent. After a period of approximately forty-five minutes, the accused asked if he could speak to his commander, and the investigator immediately departed from the room. About a minute later the investigator was called back into the room and the commanding officer stated that accused had admitted taking the money in question. Accused then accompanied the investigator back to his office at his commander's request whereupon he gave a complete statement relative to taking the money, and supplemented it later with another statement. These two written statements were introduced in evidence at trial as prosecution exhibits 6 and 7.

This Court granted review on a question involving the admissibility of the two out-of-court statements of appellant above-mentioned. In their briefs, both appellate defense counsel and appellate Government counsel submit the case on the substantive question of whether the law officer erred in admitting into evidence the two out-of-court statements of the appellant.

The facts giving rise to the question before us are properly stated by appellant's counsel, substantially, as follows.

During the trial, after the prosecution had presented evidence of an unlawful entry into the room, and the loss of some $55.00 or $60.00 by a Naval petty officer, Mr. Fuller, a Special Agent of the Office of Special Investigations, was called as a witness. The agent testified that during the course of his investigating the alleged crime, he had occasion to interview the accused as a suspect on the day following the commission of the offense. The accused was, according to the agent, advised of his rights and interrogated in pursuance of the investigation, but the accused remained silent. Later in the trial, as soon as another Special Agent, one Jones, was sworn as a witness, the defense asked for and was granted an out-of-court hearing on the issue of admission of any confession.

In the out-of-court hearing the entire evidence regarding taking the confession of accused was presented to the law officer in the form of the examination of two witnesses and the accused. Agent Jones continued to testify at this hearing to the effect that he was assigned the duty to aid in investigating the unlawful entry and larceny of money. In the course of this investigation he was called upon to contact the accused on five occasions. At the very beginning of each contact the agent testified that he advised the accused of Article 31, reading the Article from a card. According to his testimony, on January 17, 1962, Agent Jones accompanied accused to the interrogation room of the OSI, whereupon he advised accused of his rights and they discussed accused's financial status, and the arrangement made by accused to get his car repaired at a civilian garage. At the agent's request they drove to the garage where a short discussion between the agent and the manager took place.

590

Upon his return to the car the agent took the accused to accused's commanding officer, Lieutenant Colonel Bean, for the purpose of clearing up a point concerning some traffic tickets in the name of accused. Agent Jones testified that after a few minutes on that subject he briefed the commander on the status of the larceny case which was then approximately five to six weeks old and upon which very little progress had been made toward concluding it. During this briefing, accused was asked some questions by both the commanding officer and the agent, but the accused remained silent.

The agent continued his testimony to the effect that the commander and he discussed the facts a "couple of times" and the accused refused to answer any questions or add to the discussion. Then after fifteen minutes of this, accused "asked if he might speak with his commander alone." To this the agent replied, "of course," and got up and left, closing the door. A minute or so later he was called back in and Lieutenant Colonel Bean told him that accused had admitted taking the money. Thereupon, the agent asked accused to accompany him to the OSI to discuss the matter further, the final result being two statements sworn to by the accused.

Appellate defense counsel contend that on cross-examination the text of the testimony changed. They argue the agent admitted, in his testimony, that he really didn't take accused to Lieutenant Colonel Bean to investigate traffic tickets, contending his real reason was brought out in the following question on cross-examination: "What you were trying to do was trap him into some kind of false statement, is this what it amounts to?" Answer: "No, sir, it wasn't." Inquiry was then made: "But that's the reason you went to see Major Bean?" to which the answer was given, "That's the reason, yes, sir." Although the agent did not testify on direct examination that during the discussion on the theft, Lieutenant Colonel Bean made any statements to accused which might be construed as inducements, or threats, he did on cross-examination testify that

Lieutenant Colonel Bean asked accused, "if he had been involved in this thing, in this theft, why he didn't go ahead and advise us of it. He asked if there were any extenuating circumstances why he might have taken this money." When queried if Lieutenant Colonel Bean had said, " 'Why don't you get it off your chest and confess?' " the agent testified, "He might have." In answer to an inquiry as to what Lieutenant Colonel Bean was saying that wasn't a question, the agent witness replied, "Again, he asked Airman Goard if he was involved in this thing to go ahead and get the thing out in the open, and he asked if there were any extenuating circumstances." Clarification of that answer was sought, and the witness continued, in response to this question:

"Q. This isn't like questions, or was he putting them in the form of 'Do this', or 'Go ahead', more in the form of a direction?

"A. I think it might have been a direction to say, if you are involved in this thing, let's get it out in the open."

Shortly thereafter the agent testified that neither he nor Lieutenant Colonel Bean, immediately prior to this last discussion, advised the accused of his rights to remain silent or of any of his rights under Article 31.

After the investigator had given his evidence, Lieutenant Colonel Bean, the accused's commanding officer, testified that OSI Agent Jones came to his office and told him he had "run into a brick wall" as regards the investigation surrounding the theft of money from the barracks. The agent then suggested they call accused in and ask him about that incident. During this conversation Lieutenant Colonel Bean asked accused if he had taken the money and told him, "if he ever expected me to help him, as his commander, he ought to be honest with me."

Agent Jones was also asking questions of the accused in between discussing the facts as developed to date. In answer to the question as to whether he was prodding at the accused, Lieutenant Colonel Bean testified,

"Well, I don't know how you could interpret prodding, but I was after an honest answer." Lieutenant Colonel Bean testified that he did not advise the accused of his rights under Article 31, but felt Jones did. Accused remained silent throughout most of the conference, but at the end asked to talk to his commander and then told him that he took the money. Immediately Lieutenant Colonel Bean called the agent into the room and told him of accused's admission, after which he "told Goard to go along with Mr. Jones."

On cross-examination it was brought out that Agent Jones had given Lieutenant Colonel Bean regular reports on the investigation by phone and, on January 17th, had primarily come to tell him that he had run into a brick wall. The agent had previously told him that Airman Goard was adamant in his answers that he was not guilty; he had also mentioned the fact that accused had been given a lie detector test, and the results of the test. But Lieutenant Colonel Bean wanted to make sure in his own mind that "either he had done it, taken this money, or he had not taken this money." Lieutenant Colonel Bean admitted that more than once he asked accused, "why don't you get it off your chest?" He also testified that he felt Agent Jones suspected accused of the theft from his attitude at this meeting.

The accused followed Lieutenant Colonel Bean as a witness and testified to the effect that he was scared of Lieutenant Colonel Bean, and that the colonel kept repeating to get it off your chest and come clean. The accused was under the impression that he was not being asked, but was being told to get it off his chest; and that Lieutenant Colonel Bean believed he had taken the money, with no thought of his innocence. Accused testified he believed also that, "When . . . [his commander] said, I can't help you in my position unless you come clean, I figured that was what he wanted and if I went ahead and did it he would help me." When Agent Jones returned to the room, after accused had asked to talk to his commander alone and

Lieutenant Colonel Bean had said that Goard had admitted taking the money, he felt that Lieutenant Colonel Bean's utterance to go with the agent, meant he wanted accused to go with him for the purpose of making a confession in writing. That is why he signed the confession. On cross-examination accused denied he had been advised of his rights by the agent on January 17th prior to going into Lieutenant Colonel Bean's office. He testified that although he didn't ask Lieutenant Colonel Bean to keep this confidential he would think Lieutenant Colonel Bean would know. He reiterated that he thought he had to make a statement because Lieutenant Colonel Bean had told him to go with the agent. In explaining his belief that Lieutenant Colonel Bean would keep this confidential, he stated, "To me, it was obvious that if I had wanted to confess, I would have left Special Agent Jones in the room"; and that he didn't expect his commander to repeat it. He further explained that the way the commander put it, "to come clean," he believed it would be confidential and couldn't be used against him. Appellant stated: "He said the only way I can help you, if you come clean. By him saying that, if I had told him, if he could help me, I didn't see how he could help me by telling somebody else."

After the accused was excused, Agent Jones was recalled as a witness and restated much of his previous testimony, but did state that during the conference, Lieutenant Colonel Bean referred to himself on several occasions as accused's commander in these words, "I am your commander; you are under my command," but did not remember any specific comment. Lieutenant Colonel Bean was also recalled and, among other testimony, gave the following answer to a question:

"I believe I asked him on several occasions if he had done this thing, if he had taken the money. He remained adamant during the discussion, he didn't say 'yes' and he didn't say 'no'. And, as I stated yesterday, that I felt it was my duty, as his commander, to find out whether he did or whether he didn't."

Lieutenant Colonel Bean stated he had conducted an investigation previously and indicated he knew the requirements contained in Article 31. Lieutenant Colonel Bean was fully aware that the accused was suspected of committing the crime by the OSI, but was hesitant to say that he also suspected accused. In any event he felt it was his duty to find out.

During the out-of-court hearing the defense counsel had objected to admission of prosecution exhibits 6 and 7 into evidence, but the objection was overruled. At the request of defense counsel the testimony taken in the out-of-court hearing was not presented to the court-martial. Also, at his request the issue of voluntariness was not submitted to the court-martial.

Defense counsel before the court-martial was a captain of the Judge Advocate General Department, certified in accordance with Article 27(b), Uniform Code of Military Justice, 10 USC § 827. His conduct of the trial of this case would indicate considerable trial experience. He was skillful and adroit. In the out-of-court hearings on the admissibility of appellant's confessions, continuing for a total of more than six hours, defense counsel developed the facts in an able and fearless manner and argued the legal questions with what may fairly be characterized as more than the average acumen. It is abundantly clear he followed a preconceived trial strategy in requesting that the testimony taken at the out-of-court hearing be not presented to the court-martial, and in requesting that no instruction on voluntariness be submitted to it. We are not disposed to question the strategy followed. Actually, under the situation in this case, we endorse the same. Its efficacy seems to have been proven by a sentence of bad-conduct discharge and confinement for a period of three months for convictions which would have supported maximum punishment extending to dishonorable discharge and confinement for ten years. The offenses are aggravated to the extent that they constituted an unlawful entry of a private room assigned to members of a sister service, in which two window screens were forcibly opened and the lock on a metal locker was broken; and a barracks larceny of over $50.00 in cash, which the appellant squandered the same evening.

Article 51(b), Uniform Code of Military Justice, 10 USC § 851, provides, in part, as follows:

"The law officer of a general court-martial and the president of a special court-martial shall rule upon interlocutory questions, other than challenge, arising during the proceedings. Any such ruling made by the law officer of a general court-martial upon any interlocutory question other than a motion for a finding of not guilty, or the question of accused's sanity, is final and constitutes the ruling of the court."

Paragraph 57g, Manual for Courts-Martial, United States, 1951, in part, reads as follows:

"The ruling or decision of an interlocutory question should be preceded by any necessary inquiry into the pertinent facts and law. . . . Upon such inquiry, questions of fact are determined by a preponderance of the evidence."

Along with most other courts, this Court has held from its beginning that where the evidence touching upon admissibility is in conflict, or where the admitted facts permit different inferences, the law officer's ruling admitting a pretrial statement will not be overturned if there is evidence to support it. United States v Monge, 1 USCMA 95, 2 CMR 1; United States v Webb, 1 USCMA 219, 2 CMR 125. However, where there is no conflict or dispute as to the evidence, or it is subject to but one conclusion or inference, this Court may hold, as a matter of law, that the pretrial statement was inadmissible because procured in violation of Article 31 of the Uniform Code, supra. United States v Williams, 2 USCMA 430, 9 CMR 60; United States v Rose, 8 USCMA 441, 24 CMR 251; United States v Walker, 9 USCMA 187, 25 CMR 449.

We will not undertake to set out

all of the evidence heard in the very lengthy out-of-court hear- ings on the confession. We do find material conflict in the evidence and certainly sufficient evidence to sustain the law officer's decision to admit the confessions, based upon his view of the evidence. We believe the testimony of appellant in the out-of-court hearings, of itself, is sufficient to sustain the ruling of the law officer. For instance, appellant's responses to the following inquiries are illuminating:

"Q. What sort of help did you think . . . [your commander] could give you?

"A. Sir, really, I don't know what kind of help.

"Q. You didn't have anything particular in mind, then?

"A. No, sir.

"Q. And you really didn't have anything particular in mind when you said you were afraid or scared of Major Bean, anything special or particular?

"A. No more than just, he was squadron commander."

Accused admitted many Article 31 warnings prior to the conference with Major—later Lieutenant Colonel— Bean. When asked why he felt his oral confession would be kept confidential, accused said:

"When he said, the only way I can help you is to come clean.

"Q. You took it from that, he would keep in confidence all you told him?

"A. Yes, sir.

"Q. But he said this in the presence of Agent Jones, didn't he?

"A. Yes, sir, he said this in the presence of Agent Jones.

"Q. Did he ever tell you he would keep it to himself?

"A. No, sir.

"Q. And you assumed, from his statement, the only way I can help you is to come clean, that if you did tell him about it, or make a statement to him, that he would keep it in confidence?

"A. Yes, sir.

"Q. Can you explain why you got that impression from that statement?

"A. He said the only way I can help you, if you come clean. By him saying that, if I had told him, if he could help me, I didn't see how he could help me by telling somebody else."

Conceding, *arguendo*, the inferences drawn by appellant to be reasonable and justified, we submit that the law officer could have drawn different inferences therefrom, equally reasonable and justified. Under those circumstances and in view of the interlocutory nature of the question posed, we cannot overturn his ruling. We must accept the determination of the law officer on the question of admissibility whenever it is supported by substantial evidence, regardless of whether we, as individuals, might resolve the conflict otherwise, or draw different inferences from the facts. If the law officer could reasonably conclude the evidence was admissible, then we must affirm. See United States v Monge, supra, at page 98.

In the recent case of United States v Acfalle, 12 USCMA 465, 31 CMR 51, a particularly aggravated case on the facts, we said at page 469:

"We do not, however, conclude that Acfalle's two statements were inadmissible as a matter of law. While the tactics employed by Agents Platt and Lane are deplorable, there are circumstances in the record from which both the law officer and the members of the court-martial could infer that accused confessed, not because of his removal from Guam to Japan, his airsickness, the illness of his relatives, the lack of full communication with his wife and brother-in-law, and the other circumstances here depicted, but because of an overwhelming consciousness of guilt."

We call attention to United States v Sapp, 1 USCMA 100, 2 CMR 6; United States v Colbert, 2 USCMA 3, 6 CMR 3; United States v Cooper, 2 USCMA 333, 8 CMR 133; United States v Wilcher, 4 USCMA 215, 15 CMR 215; United States v Volante, 4 USCMA 689, 16 CMR 263; United States v Dandaneau, 5 USCMA 462, 18 CMR 86;

United States v Howell, 5 USCMA 664, 18 CMR 288.

We are unable to find error in the decision of the law officer in admitting either of the two out-of-court statements of appellant.

The decision of the board of review is affirmed.

Chief Judge QUINN concurs.

FERGUSON, Judge (dissenting):

I dissent.

This case represents to me an astonishing departure from the real meaning and purpose of Uniform Code of Military Justice, Article 31, 10 USC § 831. So construed, in light of the admitted facts, the bulwark erected by Congress to guard against the coercive influence inherent in interrogation by a military superior is substantially weakened.

The accused became a suspect in the alleged larceny and was interrogated by Agent Jones on several occasions. Before each such interview, he was appropriately warned of his rights under Code, supra, Article 31, and advised of the nature of the offense of which he was suspected. On January 17, 1962, accused was again advised of his rights by Agent Jones at approximately 9:30 a.m. He steadfastly denied his guilt. A matter involving accused's finances and relevant to the investigation came up. Agent Jones and accused proceeded "downtown" to check on an aspect of this question. Some traffic tickets were also mentioned, and "to get this point cleared up," Jones decided to take accused "to see his commander," a Major Bean. They arrived at Bean's office at approximately 10:30 a.m. After Jones "talked with Major Bean regarding this other subject, I briefed him . . . on what I had learned during the course of my investigation to date." According to Jones, he did not speak to Bean except in the accused's presence.

Bean, promoted to lieutenant colonel by the time of the trial, testified he was accused's commanding officer on January 17. On that date, Agent Jones visited him, asked about the traffic tickets, and told him "he had run into a brick wall as regards the [larceny] investigation." At first, the accused was not present, and Jones "suggested that we call him over and ask him about it, which we did." Jones inquired once more about the traffic tickets in accused's presence, and "the conversation went from traffic tickets to the alleged theft." Lieutenant Colonel Bean then declared, "I can't recall everything that was said, but I did ask him if he had taken the money, *and I told him if he ever expected me to help him, as his commander, he ought to be honest with me*." (Emphasis supplied.)

Lieutenant Colonel Bean further stated accused said nothing. Asked whether he was "prodding" accused, he testified:

"A. Well, I don't know how you could interpret prodding, but *I was after an honest answer*." [Emphasis supplied.]

Bean was "sort of testing" accused for, "if he remained adamant he hadn't taken the money," he would have caused the investigation to be terminated. When asked whether accused could have interpreted his questions as an order to speak, Lieutenant Colonel Bean conceded that defense counsel might "have a point," but did not believe he would consider himself compelled to speak "if my Wing Commander called me in and asked me if I had done something wrong to answer 'Yes' *if I hadn't done it wrong*." (Emphasis supplied.) It was Bean's impression that accused "may have thought he had a duty to be honest with" him.

Accused asked if he could speak to Bean alone. The Colonel assented, and Jones left the room. Accused blurted out, " 'I took it. I took the money'." Jones was called back in the room and Lieutenant Colonel Bean informed him of what accused had said. Jones asked accused to return with him to Office of Special Investigations headquarters, "so we might discuss the matter further." There, he again advised Goard of his rights under Code, supra, Article 31, and accused made the written statement which was received in evidence. Three days later, accused executed an additional statement, which amplified the earlier one.

Accused, testifying in his own behalf, declared he confessed because he "figured that was what he [Bean] wanted and if I went ahead and did it he would help me." Thereafter, he believed he "had to make a statement" to Agent Jones. The confession was motivated by "fear of what he [Bean] could do, as being a commanding officer."

From the foregoing, it will be seen that, according to the Government's own witnesses, the criminal investigator took the accused before his squadron commander, Lieutenant Colonel (then Major) Bean, after informing the latter that he "had run into a brick wall" in the investigation; that the accused had in fact refused in all previous interviews to incriminate himself; that the accused was not advised of his rights under Code, supra, Article 31, during his interrogation by Lieutenant Colonel Bean; that he was repeatedly and mercilessly importuned by Bean to make a statement or else the latter, as commanding officer, could not help him; and, finally, that he made the statements only because he feared Bean's reaction as his commander if he did not confess. Seldom have I seen a more cavalier disregard of an accused's rights.

Code, supra, Article 31, commands that *no person* "subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense," unless he first advises him of his privilege to refuse to make any statement at all. The statute also prohibits the receipt in evidence of any statement "obtained from any person in violation of this article" or which was obtained by use of, among other things, any "unlawful inducement."

In United States v Gibson, 3 USCMA 746, 14 CMR 164, the Chief Judge pointed out, at page 752:

". . . Careful consideration of the history of the requirement of warning, compels a conclusion that its purpose is to avoid impairment of the constitutional guarantee against compulsory self incrimination. *Because of the effect of superior rank or official position upon one subject to military law, the mere asking of a*

question under certain circumstances is the equivalent of a command." [Emphasis supplied.]

In his concurring opinion, the late Judge Brosman pointed to deep Congressional concern, in enacting the warning requirement, "with the possibly subtle effects of military position and habits of obedience in inducing an accused to respond to questions relating to an alleged offense." *Gibson,* supra, at page 755. Cf. United States v Dandaneau, 5 USCMA 462, 18 CMR 86; United States v Green, 7 USCMA 539, 23 CMR 3; United States v Souder, 11 USCMA 59, 28 CMR 283; United States v Tharp, 11 USCMA 467, 29 CMR 283.

This Court has thus repeatedly declared that one of the principal purposes in requiring an accused to be advised of his rights under Code, supra, Article 31, is to remind him forcefully of his privilege to remain silent and to erect a shield between him and the inherently coercive influence of questioning by a military superior. Other facts may call for another conclusion, but, in this case, it seems to me that such advice was required, as a matter of law, from Lieutenant Colonel Bean. The record strongly depicts Bean's use of his superior rank and position as a commander in every possible way to induce accused to make a statement. That he may have been honestly motivated or actually believed accused innocent is immaterial. The question before us is the effect of his interrogation on the accused, and the evidence shows beyond cavil that the latter surrendered his independent desire to remain silent only because of the awe and fear instilled by the former's military capacity. Under such circumstances, I would hold that the failure again to advise accused of his rights under Code, supra, Article 31, at the outset of this interview in and of itself vitiated the later confessions to Agent Jones, premised as they were upon his earlier, less detailed statement to Bean. United States v Powell, 13 USCMA 364, 32 CMR 364; United States v Bennett, 7 USCMA 97, 21 CMR 223.

Assuming, however, Jones' earlier warning still effectively remained in accused's consciousness, I would, under

the circumstances of this case, hold the confessions inadmissible as the result of unlawful inducement. Lieutenant Colonel Bean admitted he had repeatedly told the accused he would not help him in his difficulties unless he made a statement. He conceded accused might have interpreted his language as an order to speak and that he was insistent upon "an honest answer." Accused testified he confessed only out of fear of Bean's position and because he believed he could not otherwise obtain his assistance as commander.

It is impossible to believe that any young enlisted man is going to resist the relentless questioning of a field grade officer who is directly over him in the chain of command when he is offered the alternative of either remaining silent and being thrown to the wolves or, in Bean's own language, giving an "honest answer" and having the commander stand behind him.[1] That sort of thinking ignores the realities of military life. In short, Bean's tactics correspond precisely to the sort of situation which was envisioned in United States v Gibson, supra, when it was declared that "the mere asking of a question under certain circumstances is the equivalent of a command."

That the two statements made to Agent Jones and admitted into evidence over accused's objection were the product of the earlier, illegally obtained confession to Lieutenant Colonel Bean is also established, as a matter of law, by this record. As noted above, the first such statement to Jones was obtained immediately after Bean's importunate interrogation and as a direct result thereof. The second, although more widely separated in time from Bean's questioning, merely enlarged upon the first. While accused was, on each occasion, again advised of his rights under Code, supra, Article 31, Jones at no time informed him that the prior statement to Bean could not be used against him. In United States v Bennett, supra, we said, at page 101:

". . . [W]e now announce the rule that if the Government obtains admissions illegally, and they are of a nature likely to produce a subsequent confession, a strong showing that a subsequent warning severed the presumptive influence must be made to permit use of the confession. Furthermore, absent any showing that the accused knew or had been informed that his prior admissions could not be used against him, the fact that he was advised of his rights prior to the execution of his confession would normally not . . . [make it admissible]."

In like manner, in United States v Powell, supra, we applied the *Bennett* rule to hold inadmissible two subsequent confessions after proper warning under Code, supra, Article 31, because of an earlier statement made by the accused while he was deprived of counsel. In that case, an entire weekend intervened between the interrogations, but it was concluded that the United States had not borne its heavy burden of demonstrating a severance of the presumptive influence of the earlier statement.

Applied to the facts now before us, these cases make it clear that the prosecution in this case failed utterly to make any showing of dissipation of the influence of the statement made by Goard to Lieutenant Colonel Bean in the forlorn hope of obtaining his help as commander in the forthcoming trial.

In sum, then, I am of the view that under the facts of this case, Lieutenant Colonel Bean was required again to advise accused of his rights under Code, supra, Article 31, prior to importuning him to speak. I note with some surprise that my brothers make no attempt to discuss this problem, as important as it is to resolution of the issue before us. Moreover, I firmly believe that all the evidence indicates that Bean intended, and the accused concluded, that his rank and position be used to compel accused to make a statement regarding his guilt. Such amounts to an unlawful inducement and, as it led to the subsequent statements made to Jones, made

---

[1] In light of Lieutenant Colonel Bean's professed desire to assist Goard, it is, to say the least, interesting to note that, following the trial, he recommended affirmance of the sentence as adjudged and questioned Goard's "future usefulness in the service."

the latter inadmissible as a matter of law. United States v Bennett, supra; United States v Powell, supra.

I would, therefore, reverse the decision of the board of review and order a rehearing.