UNITED STATES, Appellee

v

HENRY E. SCHULTZ, Private First Class,
U. S. Army, Appellant

19 USCMA 311, 41 CMR 311

No. 22,353

March 13, 1970

*Captain Norman L. Blumenfeld* argued the cause for Appellant, Accused. With him on the brief were *Colonel Daniel T. Ghent* and *Captain Monte Engler.*

*Captain Edwin L. Gage* argued the cause for Appellee, United States. With him on the brief were *Colonel David T. Bryant, Major Edwin P. Wasinger,* and *Captain William R. Steinmetz.*

DARDEN, Judge:

Contrary to his plea, the appellant was convicted by a general court-martial in Wurzburg, Germany, for the premeditated murder of Specialist Four Robert G. Montpas. He was sentenced to a dishonorable discharge, total forfeitures, confinement at hard labor for life, and reduction to the grade of E-1. A board of review, however, reduced the finding to unpremeditated murder and the confinement period to forty-five years. The Court has the case to consider two questions:

Whether Prosecution Exhibits 2 and 3 were improperly admitted into evidence.

Whether evidence that appellant was identified at a lineup was erroneously admitted to his substantial prejudice.

The record shows that the victim, Montpas, was asleep in his bunk during the early morning hours of June 15, 1968, and that at about 2:50 a.m., he was stabbed four times—twice in the head and once in both the right shoulder and the neck—with a sharp, knife-like instrument. The victim's shout and the sound of gushing blood from the neck wound awakened roommates, who saw a figure walk across the room and out the door. Montpas was able to pursue his assailant a short distance out of the room and down the hallway before he collapsed and died in a pool of blood. Cribbs, one of the awakened room occupants, was clearly heard by others in the room to yell "Schultz" as the murderer crossed the room. He did not later recall uttering the name out loud, although he recalled "thinking" Schultz. When the duty officer arrived at the scene Cribbs told this officer that the person seen in the room reminded him of the appellant. To others, he said, "I think it was Schultz." At trial, he could not make a more positive identification. The intruder was described as a Caucasian, wearing dark clothes, of about the same height and physique as Schultz.

While the authorities were looking for the appellant, he appeared in the orderly room and inquired about what was going on. An hour or two before the incident Schultz had been carried in jest out of the victim's room by two of its occupants and had not been let back in. The victim was not involved, and Schultz seemed to have accepted the event in good humor.

The appellant was interrogated by Criminal Investigations Detachment agents about 4:30 a.m., June 15, 1968. He was advised of his rights under Article 31, Uniform Code of Military Justice, 10 USC § 831, and was told also that he could have the assistance of counsel if he so desired. Schultz responded that he didn't need a "lawyer" at that time. He informed his interrogators that he had recently been transferred from Company A to Headquarters Company and that at about 6:00 o'clock the previous evening he had returned to Company A to check on his mail. He then went to the enlisted men's club, where he remained until about 10:00 p.m. He related that he returned to Company A and visited in the victim's room for a short while, leaving the building near 10:30 p.m. He returned to his own billet and went to sleep, awakening at about 2:50 a.m. He secured keys to the motor pool from the charge of quarters of Headquarters Company but found they were the wrong set, so he had to return to get others. At the motor pool he secured a jeep that he drove back to the company. He there met military police. Following this interview he was released.

Between 10:00 and 11:00 a.m. the same day, CID agents spoke to the appellant's commanding officer to secure authority for a search of the appellant's wall locker. They were looking for anything that might have blood on it, "any type of weapon, sharp instrument, particularly a knife." They described to this officer the information that had been given them regarding the murderer's looking and having a physique like Schultz. The officer was told that Cribbs had specifically mentioned the appellant's name. Although he had also ordered a battalion "shakedown," the

company commander specifically declared that he had authorized the search on the basis of the information given him by CID agents connecting the appellant to the crime. With this authorization, the appellant's wall locker was searched, and, among other things, a wet towel was seized. At the same time the appellant was asked what clothes he had worn the night before. When he replied that he was then wearing the same clothes, this clothing was also seized.

Laboratory analysis revealed blood of an unidentifiable type in the towel. Blood, Type A, was found on the trousers. This garment had twenty or thirty spots of blood. It had not been "brushed" on but was "fluid" when it hit the trousers. Montpas had blood of this type; Schultz had Type O. The trousers were later admitted into evidence as Prosecution Exhibit 2, and the towel was admitted as Prosecution Exhibit 3. Schultz was interviewed again after this. His story was substantially the same as that given before.

This search was followed by a battalion lineup. All the participants were advised of their rights to counsel beforehand. The witnesses were positioned so that they might watch each participant walking past a window. The "walk by" was performed first by the entire battalion and then by a group of fifteen to twenty men. Because the appellant was one of two who had been picked out the first time as having the general characteristics as the assailant, he became a participant in the second lineup. He was again picked out.

After the lineup, the appellant was interrogated between 3:30 and 4:30 p.m. He again told substantially the same story. The interrogator noted at this time, however, that Schultz had washed his hands—although he first denied having done so—and that his fingernails had been cleaned, contrary to the requests of authorities. Earlier in the day he had been taken to the dispensary for fingernail scrapings, but this could not be accomplished at the time because a physician was not present. A second visit to the dispensary had been planned.

On June 18, 1968, the appellant was interviewed by the CID agents once again. Told that other witnesses had disagreed with a portion of his story, Schultz this time related that on the night of the murder he had first visited in Montpas's room and that he then put on civilian clothes and left the post through a hole in the fence, returning a short time before 3:00 a.m. He refused to identify seven people he had been with. According to one witness, Schultz had been seen in Niederwerrn until 1:45 a.m.

Appellate defense counsel object to the admissibility of Prosecution Exhibits 2 and 3—the trousers and the towel—on several grounds: that probable cause for the search and seizure was lacking; that the search was, in reality, a part of a battalion shakedown; that the search was not limited to a specific thing to be seized; that an affidavit and a warrant were missing prerequisites; and that Schultz was not properly warned before being questioned during the search.

I am satisfied that the search of appellant's locker and seizure of the towel exceeded permissible limits. Hence the other contentions require no exploration.

When asked what he and his companions were intending to look for, Agent Wasielewski replied, "We told him [Lieutenant Rock] that we were looking for anything that may have blood on it; any type of weapon, sharp instrument, particularly a knife." The descriptive phrase clearly limits and gives meaning to the preceding portion of the quoted sentence. A request had been made and permission granted on the basis of a search for the murder weapon. Seizure of the towel from the wall locker thus went beyond this well-defined limit. United States v Alloway, 397 F2d 105 (CA 6th Cir) (1968). Schultz has suffered no prejudice, however, for the towel supplied nothing incriminating against him. United States v Simpson, 15 USCMA 18, 34 CMR 464 (1964). Seizure of the trousers involves different considerations.

Properly in the appellant's barracks and accompanied by Lieutenant Rock, the CID agents were told by Schultz, in response to their questioning, that he was then wearing the trousers that he had worn the night of the murder. His statement and the presence of visible bloodstains on the trousers resulted in the pants being seized. Seizure of this item of clothing that was in plain view was not the product of the wall locker search. United States v Thomas, 16 USCMA 306, 36 CMR 462 (1966). Nonetheless, Schultz's statement and the existence of visible bloodstains provided the probable cause that made the seizure reasonable. United States v Thomas, supra.

The interrogation that accompanied the seizure is not deficient for lack of an Article 31 or counsel warning. Schultz was advised of both rights before his first interrogation at 4:30 a.m., June 15, 1968. He was told the crime "might even be murder." He was aware, therefore, of the nature of the misconduct being investigated. A more particularized warning is not required. "It suffices if the accused is made aware of the general nature of the allegations involved." United States v Reynolds, 16 USCMA 403, 405, 37 CMR 23 (1966); United States v Rice, 11 USCMA 524, 29 CMR 340 (1960); United States v Vanterpool, 394 F2d 697 (CA2d Cir) (1968).

Warnings of this nature are not a Fourth Amendment requirement. United States v Rushing, 17 USCMA 298, 38 CMR 96 (1967); United States v Coakley, 18 USCMA 511, 40 CMR 223 (1969). The admissibility of a "statement" gained by the questioning of an accused during the search may depend, however, upon the existence of a proper Article 31 and counsel warning. United States v Williams, 10 USCMA 578, 28 CMR 144 (1959); United States v Corson, 18 USCMA 34, 39 CMR 34 (1968). "[S]eparate periods of inquiry can constitute a single continuous interrogation." United States v White, 17 USCMA 211, 218, 38 CMR 9 (1967).

Once the advice has been given, subsequent failure to repeat the warning is not error. United States v Smith, 4 USCMA 369, 15 CMR 369 (1954); United States v Goard, 13 USCMA 588, 33 CMR 120 (1963). I consider this to be such a case. The time interval between interrogations was not extensive; the same agents conducted both inquiries; and though Schultz had been released to perform driving duties, he did so on their order. He remained subject to their questioning.

Counsel for Schultz similarly contend that results of the lineup were also inadmissible because the Government had not carried its burden of showing that a proper warning was given the appellant beforehand regarding his right to counsel as is required by United States v Wade, 388 US 218, 18 L Ed 2d 1149, 87 S Ct 1926 (1967), and Gilbert v California, 388 US 263, 18 L Ed 2d 1178, 87 S Ct 1951 (1967). An extension of this argument is that there was no proper out-of-court hearing to determine whether the lineup was properly conducted, whether it was suggestive, and whether the witnesses made up their own minds. The argument continues that the witnesses' trial testimony is not shown to have been untainted by the lineup. I view the record otherwise.

Agent Wasielewski informed the court that the battalion commander had called a battalion formation. The men were told that a member of the CID was going to speak to them. Agent Roth proceeded to inform his listeners that he proposed to have each man walk by a window where someone would be observing them. They were advised that if anyone did not want to participate without the aid of "legal counsel" they could immediately fall out and inform the first sergeant or company commanders who were also present. Wasielewski was standing in the rear of the formation and could hear what Roth was saying. He saw the appellant to his left. Agent Brandon testified with equal certainty as to the appellant's presence. Under these cir-

**315**

cumstances, it is reasonable to infer that the appellant also heard the advice.

There is no showing that the lineup was suggestive. Rather, pains were taken by the Agents so that it would not be. In some jurisdictions if the witness cannot make a positive identification of the defendant, testimony regarding a previous identification is incompetent to supplement his trial testimony. In other instances, extrajudicial identification is admissible even though, on the previous occasion or at trial, the identification is not positive. See Annotation: Extrajudicial Identification, 71 ALR2d 449; State v Lawrence, 196 NC 562, 146 SE 395 (1929); State v Wong Wen Teung, 99 Ore 95, 195 Pac 349 (1921); People v Spinello, 303 NY 193, 101 NE2d 457 (1951).

Under the facts of this case, the result is the same regardless of the rule applied. Applying the former, this testimony appears admissible; under the latter, the appellant suffers no prejudice. Specialist Four Askew, Sergeant Cribbs, and a third soldier named Kemmerling, who was not a trial witness, were the three who viewed the lineup. Schultz and another had been picked out. All three thought Schultz "resembled" the unknown murderer. This identification was no more certain than that previously given the CID or that testified to by both Askew and Cribbs at trial. Neither person was willing to give an unqualified answer. Neither would say categorically that Schultz was the assailant. I am satisfied, therefore, that their in-court testimony was uninfluenced by the battalion lineup.

The decision of the board of review is affirmed.

Judge FERGUSON concurs in the result.

QUINN, Chief Judge (concurring in the result):

I disagree with the conclusion of the principal opinion that the search went beyond the limits of the authorization of the company commander.

The victim bled profusely and it was manifest that his blood would be on articles other than the murder weapon. Agent Roth testified he was present when Agent Wasielewski informed the company commander of the circumstances of the crime and "that we specifically wanted to search Schultz' belongings." That the agents understood the authorization to search comprehended a search for bloody articles belonging to the accused is apparent from Roth's statement to the accused before the search that he had received the company commander's "permission to search his *belongings*." (Emphasis supplied.) In addition, the company commander was present at the search. He testified he knew there had been "an awful lot of blood at the scene" of the murder and the authorities were "looking for bloody clothes." In my opinion, the record demonstrates that the company commander also understood that his authorization to search included articles belonging to the accused other than the possible murder weapon. I conclude, therefore, that the articles in issue were properly admitted into evidence as products of a lawful search and seizure.

As to the other issues, I generally agree with the conclusions of the principal opinion and join in affirming the decision of the board of review.