UNITED STATES, Appellee

v

GEORGE E. HENDRIX, Private, U. S. Army, Appellant

21 USCMA 412, 45 CMR 186

No. 24,644

May 26, 1972

*Norman L. Blumenfeld, Esquire,* and *Captain Peter J. Horner, Jr.,* argued the cause for Appellant, Accused. With him on the brief were *Colonel George J. McCartin, Jr.,* and *Captain Richard A. Cooper.*

*Captain Merle F. Wilberding* argued the cause for Appellee, United States. With him on the brief were *Colonel David T. Bryant, Lieutenant Colonel Ronald M. Holdaway,* and *Captain David E. Wilson.*

## Opinion of the Court

DUNCAN, Judge:

The appellant stands convicted of two specifications alleging a violation of Article 90, Uniform Code of Military Justice, 10 USC § 890. His sentence extends to a bad-conduct discharge, total forfeitures, confinement at hard labor for twelve months, and reduction to the grade of E–1. We granted review on the following issues:

1. Whether there was probable cause for the authorization of a search of the accused's living area and his personal effects at Camp Eagle, inasmuch as he had been apprehended at Landing Zone Sally.

2. Whether the evidence is sufficient as a matter of law to support a conviction for assault upon a superior officer in the execution of his office.

Both issues are related only to Charge I, specification 1, wherein it was alleged that the appellant "did . . . on . . . 15 December, 1969, push 1Lt Richard C Kielman, his superior commissioned officer, who was then in the execution of his office, on the upper region of his body with his hand."

The facts are these. On December 15, the appellant and one Daily were apprehended by military police at Camp Sally, Vietnam, for hitchhiking. The command at Camp Eagle was notified and Lieutenant Kielman was sent to get the men. Kielman, before leaving, was informed by his platoon sergeant that Hendrix and Daily "were picked up for possession of drugs and marijuana."[1] Upon return to Camp Eagle, Kielman obtained permission from Captain Gray to conduct a search of the areas where the appellant and Daily were bunked. During the search of the appellant's area, which was conducted with the assistance of three sergeants, a .38

---

[1] Apparently the sergeant's information was incorrect for no charges relating to this incident were placed against the appellant. The military judge instructed the court to disregard this portion of Kielman's testimony.

caliber pistol was the first thing found.[2] The contents of a laundry bag were then dumped out on the bed and "a plastic bag of, what appeared to me to be marijuana fell out on the bed. We continued on and we then found a letter." At this point, the following colloquy occurred:

"Q [Trial counsel]. What about the argument with the letter?

"A. All right, I had looked and thought that it was not a personal letter at that time, which had some information on it that—do you want me to go ahead with what was on the letter?

"TC: No I don't want you to go ahead with what was on the letter.

"A. Hendrix had told me that you don't have any right to look at that letter, as it were it didn't look like personal mail it had an in-country address on it and everything else, so I was going to go ahead and read it and see what was in there and he demanded that I give it back and he said, something to the effect that if I didn't give it back he was going to punch me in the mouth, and he came over and he was behind a wooden partition, approximately 3 1/2 feet, 4 feet high, and came inside his area and he pushed me and I pushed him back.

"Q. Where did he push you?

"A. Around the shoulders and chest, somewhere around here.

"(The witness pointed to the left side of his body.)

"Q. He pushed you first?
"A. Yes, sir.

"Q. With his hands?
"A. Yes, sir.

"Q. Did he use one hand or both hands?
"A. I believe he used one hand.

"Q. How hard did he push you?
"A. It wasn't that hard a push, it was not enough to move you a little bit but it wasn't a real lot.

"Q. Continue please.

"A. O.K., after I pushed him back he grabbed the letter and the bag which was suspected to be marijuana and ran out the door of the hooch. Myself and Sergeant Furgeson chased him and we ran down in front of the platoon area, up a hill and then back the other direction, in the general direction of where the orderly room was and I told him to stop several times and he didn't. Captain Gray was coming out of the orderly room, I suppose, going to chow and saw him running and saw me chasing him and told him to stop and he was fairly close to him and Hendrix at this time stopped. While he was running he was emptying the contents of the bag on the ground; this I could see and when we got to him he had the plastic bag but there was nothing in it.

"Q. Did you continue searching after that?

"A. Yes, after Captain Gray talked to him and took the letter and the plastic bag was lost, we continued to search back down in the area. Should I go on with the search?

"TC: Yes, please."

Lieutenant Kielman then testified to the finding of several pairs of trousers which, upon inspection by the Criminal Investigations Detachment, were found to contain approximately 0.69 grams of marihuana debris.[3]

On cross-examination, Lieutenant Kielman testified:

"Q. Lieutenant Kielman do you know where the letter is that you were reading when the accused grabbed the letter?

"A. Where is it now? I'm not sure of the exact location, but I turned it over to the CID.

"Q. Why were you reading his letter?

---

[2] The appellant was found not guilty of a charge of a violation of a lawful general regulation by possession of this pistol (Charge III).

**414**

[3] The appellant was found not guilty of a specification alleging the possession of this marihuana (specification 3, Charge IV).

"A. It was mixed in with some of his other stuff, boxes, we were going through every thing. I picked up the letter and he said, 'Hey you'd better put that down.' At that time I didn't really know what it was and I saw an in-country address on it, the sender's name was Shapiro and without reading it too closely I thought that Shapiro was somebody in our platoon because we do have a man named Shapiro, but I later found out this wasn't the same man and it was yellow legal paper, like you're holding there with writing on it and I saw on the end of it looking in, it had the words, pot, speed, dollar signs, money—you know $100, $20 and dates.

"Q. So you were reading the letter in order to find out what was in the letter?

"A. I saw a few of the things before I even opened up the letter and I opened the rest of it to find out what it was.

"Q. Before you read the letter had you determined that the contents of the letter were pieces of paper?

"WITNESS: Would you say that again, I don't know if I understand it.

"Q. Did you open the envelope to see what the contents were?

"A. I did not open it, it was opened already, it was torn off, a torn envelope and I think the reason it was given to me was because it was a thick envelope and we may have thought that it contained something that we were looking for, maybe, marijuana or something. I opened it up just to see if anything was in it and then I saw the words, pot, speed, and this sort of thing.

"Q. And after you determined that the envelope contained a letter, did you continue to read the letter?

"A. Yes I did, sir."

On redirect, he was asked:

"Q. Lieutenant Kielman, what was the purpose of your looking at that letter?

"A. It's hard to say, because I saw the letter there and I knew it wasn't a personal letter and I—I don't know if I can come out with any exact dates, people or places or anything, but I suspected Hendrix of selling marijuana and drugs and when I saw the dollar signs, the money, the words 'speed', 'pot' and everything else I thought this may be a key to it.

"Q. What I'm getting at is was there anything unusual about it, did it look like something that he should not have had or anything?

"A. Nothing unusual about the envelope or the writing."

Before excusing the lieutenant from the stand, the military judge instructed the court to disregard the witness' testimony that in his opinion the accused may have been selling marihuana and pot and not to consider it as evidence in the case. He later told the court that it must also disregard the lieutenant's testimony with regard to the "words in the letter referring to pot and to some figures of money."

Sergeant Maschak, who also participated in the search of the appellant's quarters (he called it a shakedown), testified that the appellant "was in the area pushing the Lieutenant and the Lieutenant restrained him by pushing him back." According to Maschak, the lieutenant fell back "Slightly, sir."

Captain Gray testified that he had authorized the search of the appellant's quarters.

"A. On 15 December, Hendrix had been apprehended at Camp Sally and we had been notified by the MP's that they had him and what they had him for and we were to send someone up to pick him up.

"Q. He was apprehended for what?

"A. There were two men involved, one was Daily and one was Hendrix, they were found on the road hitchhiking; they shook them down and they found a liquid suspected to be

**415**

some type of narcotic agent on Hendrix and on Daily they found marijuana and a liquid. Based on this Lieutenant Kielman came to me and we discussed the situation.

"Q. What were your duties at the company at that time?
"A. I was commanding officer.

"Q. Were there facts known by you on which you based your decision to order the search by Lieutenant Kielman?
"A. Yes, there was, I had received information that Hendrix had hand grenades in his area and things like this. I had received information about his area.

"Q. Did this lead you to believe that you would find marijuana when you searched the area?
"A. Yes, I did believe it, but I did because of the prior conviction."

Previously at an Article 39(a) hearing, Captain Gray had testified relative to a defense motion to dismiss a specification alleging that the appellant, on January 4, 1970, had disobeyed a lawful order to empty his pockets. Of pertinence to the issue before us is the following testimony by Captain Gray:

"On the 15th of December he [appellant] had been picked up for—with Daily and Daily was charged with suspected marijuana. Hendrix has been one of the type of the guys in the unit that normally were suspected of using marijuana and having it in his possession."

The appellant testified under oath but was not asked, on direct examination, any questions relative to the specification alleging that he had pushed Lieutenant Kielman. On cross-examination he acknowledged that he had been convicted by special court-martial, on October 11, 1969, for possession of marihuana.

Appellate defense counsel contend that the search of the appellant's living area was illegal in its inception because it was not based on the requisite probable cause. They maintain that Lieutenant Kielman was not acting in the execution of his office when the alleged assault was made because (1) the search was illegal, and (2) Lieutenant Kielman's action in reading the letter exceeded the scope of the authority to search.

Government counsel argue that since the appellant was found not guilty of the offense (specification 2, Charge IV) which was predicated upon the finding of marihuana during the search, any question as to the legality of the search is moot. Even assuming, *arguendo*, a viable issue on this point, they aver that the appellant is precluded from asserting the illegality of the search since he failed to object to the admission in evidence of the fruits thereof. Regarding the status of Lieutenant Kielman as being in the execution of his office when he was assaulted, counsel contend: (1) The search was legal; (2) even if reading the letter was beyond the scope of the authorized search, such did not serve to remove the lieutenant from the execution of his office; and (3) the appellant's remedies to manifest his right to personal privacy do not include an entitlement to assault a superior commissioned officer.

Ordinarily, the failure to object to the admission of evidence obtained as a result of search and seizure precludes the appellant from asserting on appeal that the search and seizure were illegal. The reason for the rule is that if objection is made at the trial evidence might be presented by the prosecution to show that in fact the search and seizure were legal. United States v Dupree, 1 USCMA 665, 5 CMR 93 (1952); United States v Webb, 10 USCMA 422, 27 CMR 496 (1959). However, as this Court stated in *Dupree*, at page 670:

"We recognize that there may conceivably be extreme circumstances under which it will be necessary for this Court to consider an issue of unlawful search, regardless of whether it was properly raised below."

In the case at bar, two items found in the search, a .38 caliber pistol and a quantity of marihuana, were admitted in evidence. Defense counsel did not object on the ground of illegal search; rather, the defense was based on appellant's testimony that the items were not his and that he was unaware of their location in his living area. The court acquitted him in each instance. Were it not for the controversy over the letter, the question of the legality of the search would indeed be moot, as the Government contends.

We have no way of knowing why defense counsel did not contest the issue. On the basis of the testimony of Captain Gray and Lieutenant Kielman, set forth in detail above, the existence of probable cause to search is highly questionable. See United States v Elwood, 19 USCMA 376, 41 CMR 376 (1970); United States v Clifford, 19 USCMA 391, 41 CMR 391 (1970); United States v Moore, 19 USCMA 586, 42 CMR 188 (1970); United States v Racz, 21 USCMA 24, 44 CMR 78 (1971). But even if the search were legal, we have no hesitancy in holding that the seizure of the letter and the perusal of its contents by Lieutenant Kielman was clearly beyond the authorized scope of the search and, hence, unlawful. Woo Lai Chun v United States, 274 F2d 708, 711, 712 (CA 9th Cir) (1960). In *Woo,* the court considered the reasonableness of the scope of a search where letters were seized during the course of a warrant-based search for " 'medicinals and herbs.' " The court concluded that the search was a general search, made for the purpose of obtaining evidence against that appellant, clearly beyond the scope of what was authorized under the warrant, and therefore unreasonable and unlawful. Cf. United States v Schultz, 19 USCMA 311, 314, 41 CMR 311 (1970). The military judge's recognition of this aspect of the matter is demonstrated by his instructions to the court members to disregard the lieutenant's testimony as to the written contents of the letter.

We need not, however, decide whether or not the search was legal. Lieutenant Kielman testified that when he picked up the letter the appellant said, " 'Hey you'd better put that down.' " He "told me that you don't have any right to look at that letter . . . and he demanded that I give it back and he said, something to the effect that if I didn't give it back he was going to punch me in the mouth." Despite the appellant's statements and his request for the return of the letter, Kielman continued to read it. He decided to "go ahead and read it and see what was in there." He acknowledged "[a]t that time I didn't really know what it was and I saw an in-country address on it, the sender's name was Shapiro . . . it was yellow legal paper, like you're holding there with writing on it."

The lieutenant acted with impropriety and illegality when he read the letter belonging to the appellant. Woo Lai Chun v United States, supra. The appellant had the right to consider a personal letter to be protected from the prying eyes of one who upon quick inspection could determine that no contraband was contained within the envelope. The appellant's initial request to return the letter should have been respected. Common decency and human dignity require no less. The lieutenant's rather callous disregard for the appellant's right to personal privacy and his deliberate and continued invasion thereof precipitated the physical response.

The response was minimal—a light push with one hand around the shoulders and chest. "It wasn't that hard a push, it was enough to move you a little bit but it wasn't a real lot." Apparently the assault was not spontaneous because the appellant had to come from behind a waist high (3½–4 foot) wooden partition in order to enter the living area where the lieutenant was perusing the letter. After being pushed, the lieutenant, rather than surrendering the letter, pushed back.

In our opinion, the evidence portrays a situation in which the lieutenant, by

**417**

his action, exceeded his official authority to search, and when ▮▮ reading the letter, he then was not in the execution of his office. In consequence, the appellant's response "did not, as a matter of law, detract from the authority and the person" of the lieutenant, as a lieutenant or as a commissioned officer. United States v Noriega, 7 USCMA 196, 198, 21 CMR 322 (1956); United States v Struckman, 20 USCMA 493, 495, 43 CMR 333 (1971). The findings of guilty of specification 1 of Charge I, therefore, are not sustainable as a violation of Article 90, Code, supra.

Our decision in this case raises the possibility that the accused may have been guilty of an assault upon a commissioned officer not in the execution of his office, in violation of Article 128, Code, supra, 10 USC § 928. See United States v Johnson, 43 CMR 604 (ACMR December 23, 1970). The court members, however, were not instructed on this lesser included offense. Cf. United States v Young, 18 USCMA 324, 40 CMR 36 (1969). While the matter can be cured in a number of ways not requiring further proceedings at the trial level, we believe that the interests of justice would appear to be better served by " 'a primary rather than a "secondary and derivative" redetermination of the sentence.' United States v Voorhees, 4 USCMA 509, 531, 16 CMR 83 [1954]." United States v Young, supra, at page 326.

The decision of the Court of Military Review, affirming the accused's conviction of specification 1, Charge I, is reversed. The record of trial is returned to the Judge Advocate General of the Army for submission to the convening authority. In his discretion the convening authority may dismiss the specification and direct a rehearing of the sentence on the basis of the remaining finding of guilty, or he may order a rehearing.

Chief Judge DARDEN concurs.

QUINN, Judge (dissenting):

Common law and Supreme Court opinion acknowledge the right of self-help to resist unlawful interference with personal liberty. John Bad Elk v United States, 177 US 529, 44 L Ed 874, 20 S Ct 829 (1900); United States v Di Re, 332 US 581, 92 L Ed 210, 68 S Ct 222 (1948). However, the "concept of self-help is in decline." State v Koonce, 89 NJ Super Ct 169, 214 Atl 2d 428, 436 (1965). In the context of modern society, legislatures, courts, and professional opinion perceive self-help, not as a ready and safe means to avoid unlawful restraint on personal liberty, but as exposing "the officer, the suspect, and the innocent bystander to far graver consequences than the unlawful" interference. State v Ramsdell, 285 Atl 2d 399 (Sup Ct RI) (1971); compare Bivens v Six Unknown Fed. Narcotics Agents, 403 US 388, 29 L Ed 2d 619, 91 S Ct 1999, 2004 (1971).

Self-help has even less to recommend it when interference with the person, or his property, is pursuant to a warrant issued by a competent officer. In that situation, close questions as to probable cause, reliability of the informant, and the scope of the search may arise, which cannot realistically be decided at the scene by the individual or the law enforcement officer. Also, it is questionable, in principle and logic, to say that an officer retroactively lost his official capacity as an officer because it was later determined that the warrant under which he proceeded had been issued on an inadequate showing of probable cause or upon insufficient evidence of the realiability of the informant. See United States v Simon, 409 F2d 474 (CA 7th Cir) (1969); United States v Ferrone, 438 F2d 381 (CA 3d Cir) (1971). Although dictum, what the Third Circuit Court of Appeals said in *Ferrone* about what is now called the "no sock" rule is worth quoting:

". . . For the reasons that follow, we hold that a person does not have a right to forcibly resist the execution of a search warrant by a peace officer or government agent, even though that warrant may subsequently be held to be invalid.

"Society has an interest in securing for its members the right to be free from unreasonable searches and seizures. Society also has an interest, however, in the orderly settlement of disputes between citizens and their government; it has an especially strong interest in minimizing the use of violent self-help in the resolution of those disputes. We think a proper accommodation of those interests requires that a person claiming to be aggrieved by a search conducted by a peace officer pursuant to an allegedly invalid warrant test that claim in a court of law and not forcibly resist the execution of the warrant at the place of search. The development of legal safeguards in the Fourth, Fifth, Sixth and Fourteenth Amendment fields in recent years has provided the victim of an unlawful search with realistic and orderly legal alternatives to physical resistance. Indeed, since the validity of written process is readily susceptible to judicial review, it is doubtful whether resistance to written process can ever be justified today, absent a showing of transparent invalidity. This argument is particularly forceful when applied to the execution of search warrants, where resistance often leads to violence and physical injury. A public officer supported by written process has a right to expect that citizens will respond peaceably, that neither his life nor those of other parties will be endangered, and that any dispute will be resolved through legal means."

"No sock" cases acknowledge situations in which reasonable resistance to the unlawful exercise of official authority is appropriate. In State v Ramsdell, supra, the Rhode Island Supreme Court noted that, if in effecting an arrest, the police officer uses unreasonable force, he "has exceeded the scope of his duties," and if injured by the "arrestee attempting to defend himself, the officer cannot be considered to have been injured while engaged in the performance of his duties, and the assault felony statute is inapplicable." In *Ferrone*, supra,

page 390, the Court suggested that reasonable resistance might be proper where the search is "of transparent invalidity"; the Court also indicated that "there may be . . . unlawful . . . searches, with or without a warrant, the circumstances of which would be such a provocation to a reasonable man that the seriousness of the offense of resistance ought to be mitigated." *Ibid.*, footnote 19, at page 390. Other exceptions may be exposed in particular cases.

Although not directed to search and seizure situations, our cases dealing with self-help in overcoming improper restraint of liberty have approached the subject along the general lines of the "no sock" rationale of *Ferrone* and *Koonce*, including the apparent exceptions. United States v Hangsleben, 8 USCMA 320, 24 CMR 130 (1957); United States v Gray, 6 USCMA 615, 20 CMR 331 (1956). The majority's description of Lieutenant Kielman's action as a "deliberate and continued invasion" of the accused's rights suggests that they perceive the lieutenant's conduct as being "of transparent invalidity." I view the facts differently.

According to the evidence, Lieutenant Kielman was authorized to search. The sufficiency of the authorization was not challenged at trial. The lieutenant testified that in the course of the search he discovered a laundry bag containing a plastic bag, the contents of which appeared to him to be marihuana. His testimony indicates an acquaintanceship with the substance sufficient to support his conclusion. After Kielman found the plastic bag, he found the letter in a box. The envelope was large and its bulk was "thick." It did not appear to the lieutenant to be personal mail, so he opened it "just to see if there was anything in it." Considering the nature of the substance for which the search was being made and the place in which some of the suspected substance had already been found, the lieutenant's decision was, to me, reasonable and prudent.

No marihuana was in the envelope, but "before . . . [he] even opened up the letter," Lieutenant Kielman saw the words "pot" and "speed." Other testimony by the lieutenant reasonably supports the conclusion that he understood the word "pot" to be a commonly used synonym for marihuana. In my opinion, the word was exposed to the lieutenant's view while he was lawfully examining the contents of the envelope for marihuana. Having seen the word, good sense and sound investigative practice required that he read the letter. A search can properly be conducted not only for contraband itself, but for evidence of its possession or control. Warden, Maryland Penitentiary v Hayden, 387 US 294, 18 L Ed 2d 782, 87 S Ct 1642 (1967). Consequently, as I construe the evidence, Lieutenant Kielman did not exceed the scope of his authority to search. Nor do I believe that the accused objected to the lieutenant's reading of the letter because he believed it was not lawfully subject to inspection as part of the search.

It is extremely significant that when the accused seized the letter from Lieutenant Kielman, he also seized the plastic bag of suspected marihuana, and as he ran from the area, with Lieutenant Kielman in pursuit, he "empt[ied] the contents of the bag on the ground." The evidence convinces me that the accused was not provoked to self-help because he believed he was being subjected to unlawful intrusion into his privacy, but that he seized the plastic bag and the letter to destroy evidence that he knew was incriminating. I would affirm the decision of the Court of Military Review.